**AMERICAN JEWISH CONGRESS et al., Appellants,**

v.

**Juanita M. KREPS, Secretary of Commerce, et al.**

**No. 76–1559.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 1, 1977.

Decided March 15, 1978.

Rehearing Denied April 27, 1978.

---

Joel H. Levy, Washington, D. C., with whom Howard M. Liberman, Washington, D. C., was on the brief, for appellants.

Bruce E. Titus, Atty., Dept. of Justice, Washington, D. C., of the bar of the Supreme Court of Virginia, pro hac vice, by special leave of court, with whom Rex E. Lee, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellees. Jeffrey Axelrad, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for appellees.

Girardeau A. Spann and Diane B. Cohn, Washington, D. C., filed a brief on behalf of Mark Green, et al., as amici curiae, urging reversal.

Before TAMM, ROBINSON and ROBB, Circuit Judges.

Opinion for the Court filed by SPOTTS-WOOD W. ROBINSON, III, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This appeal summons us to investigate the scope of Exemption 3 of the Freedom of Information Act, as revised in 1976,[1] in order to determine whether Section 7(c) of the Export Administration Act of 1969 [2] fits within the purview of that exemption. We conclude that Section 7(c) is not a statute calling the current version of Exemption 3 into play. We accordingly reverse the judgment under review, which denied appellants access to information on the basis of Section 7(c), and remand the case for further proceedings.

### I

The Export Administration Act of 1969 endows the Secretary of Commerce with

---

1. Pub.L. No. 89–487, 80 Stat. 251 (1966), codified by Pub.L. No. 90–23, 81 Stat. 55 (1967), as amended by the Government in the Sunshine Act, Pub.L. No. 94–409, § 5(b)(3), 90 Stat. 1247 (1976), 5 U.S.C. § 552(b)(3) (1976), quoted in text *infra* at note 30.

2. Pub.L. No. 91–184, § 7(c), 83 Stat. 845 (1969), 50 U.S.C.App. § 2406(c) (1970), quoted in text at note 12 *infra*.

broad power to impose export controls in pursuit of specified objectives.[3] One of these goals—congressionally declared to be "the policy of the United States"[4]—is "to encourage and request domestic concerns engaged in . . . export[ing] . . . to refuse to take any action . . . which has the effect of furthering or supporting the restrictive trade practices or boycotts fostered or imposed by any foreign country against another country friendly to the United States."[5] The Act commands the Secretary to issue regulations requiring domestic exporters asked to take any such action to report the request to the Secretary,[6] and the Secretary has so prescribed.[7] Substantial penalties attend any failure to furnish the information required by the regulations.[8]

Inspired by a 1975 newspaper article, appellants sought access to these boycott-request reports and allied information[9] under the auspices of the Freedom of Information Act.[10] The Secretary took the position that much of the desired material was "specifically exempted from disclosure" within the meaning of that legislation[11] by reason of Section 7(c) of the Export Administration Act, which provides:

> No department, agency, or official exercising any functions under [the Export Administration Act] shall publish or disclose information obtained hereunder which is deemed confidential or with reference to which a request for confidential

treatment is made by the person furnishing such information, unless the head of such department or agency determines that the withholding thereof is contrary to the national interest.[12]

Since the Secretary did not regard disclosure as "serv[ing] a constructive purpose or contribut[ing] to the national welfare,"[13] he declined to release either the reports or any information gleanable from them that might identify particular exporters, although he did furnish appellants with statistical tabulations of the number and general format of boycott requests.[14]

Appellants subsequently repaired to the District Court in an effort to establish their right of access. The court, however, was of the view that Section 7(c) was "comparable to the statute discussed [by the Supreme Court] in *FAA Administrator v. Robertson,* . . .[15] and that under the rationale of that Opinion, Plaintiffs herein are not entitled to the documents sought by this action. . . . "[16] It therefore granted the Secretary's motion for summary judgment,[17] from which this appeal is taken.

## II

Two facets of this case have been substantially altered by occurrences postdating the District Court's disposition. First, Congress amended Exemption 3 of the Freedom of Information Act on September 13, 1976,[18]

**3.** Export Administration Act of 1969, §§ 4–5, as amended, 50 U.S.C.App. §§ 2403–2404 (1970).

**4.** Export Administration Act of 1969, § 3(5), 50 U.S.C.App. § 2402(5) (1970).

**5.** *Id.*

**6.** *Id.* § 4(b)(1), 50 U.S.C.App. § 2403(b)(1) (1970).

**7.** 15 C.F.R. § 369.4 (1977).

**8.** See Export Administration Act of 1969, § 6, 50 U.S.C.App. § 2405 (1970); 15 C.F.R. § 387.1 (1977).

**9.** See Defendants' Exhibit 1, Joint Appendix (J. App.) 18–20.

**10.** 5 U.S.C. § 552(a)(3) (1976).

**11.** See 5 U.S.C. § 552(b)(3) (1976).

**12.** 50 U.S.C.App. § 2406(c) (1970).

**13.** Defendants' Exhibit 5, J.App. 56.

**14.** Defendants' Exhibit 2, J.App. 22–23, 29–34.

**15.** 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975).

**16.** *American Jewish Congress v. Morton,* Civ.No. 75–1541 (D.D.C. Apr. 30, 1976) (unreported), J.App. 70.

**17.** *Id.*

**18.** Government in the Sunshine Act, Pub.L. No. 94–409, § 5(b), 90 Stat. 1247 (1976), 5 U.S.C. § 552(b)(3), quoted in text *infra* at note 30.

in order "to overrule the decision of the Supreme Court in . . . *Robertson* . . . ,"[19] on which the District Court had here relied. Beyond peradventure, as counsel for the Secretary conceded at oral argument, that amendment now governs.[20] Thus the law by which the District Court was bound is no longer controlling.

Second, the Secretary's authority under the Export Administration Act lapsed on September 30, 1976, by expiration of the fixed terms of that legislation.[21] The powers that he had exercised thereunder were then continued by an Executive Order of that date[22] until Congress revivified the Secretary's role on June 22, 1977.[23] This hiatus in the legislation poses the thorny question whether material that, when submitted, was "specifically exempted from disclosure by statute"[24] lost its exemption once the statute went into remission. We

need not grapple with that issue here, however, for we find that Section 7(c) of the Export Administration Act of 1969 is not a provision that "specifically exempt[s]" the sought-after data from disclosure within the contemplation of amended Exemption 3 of the Freedom of Information Act.

### III

In *Robertson,* the Supreme Court explained the original Exemption 3[25] as a device whereby Congress "permit[ted] the numerous laws then extant allowing confidentiality to stand."[26] Accordingly, the Court held that a statute barring divulgence of material "when in [the] judgment" of administrative officials specified consequences would follow[27] justified nondisclosure under the Freedom of Information Act notwithstanding its grant of a "broad de-

**19.** H.R.Rep.No. 1441, 94th Cong., 2d Sess. 14 (1976) (conference report); U.S.Code Cong. & Admin.News 1976, p. 2250.

**20.** *Ziffrin, Inc. v. United States,* 318 U.S. 73, 78, 63 S.Ct. 465, 469, 87 L.Ed. 621, 625 (1943); *Hines v. Davidowitz,* 312 U.S. 52, 60, 61 S.Ct. 399, 400, 85 L.Ed. 581, 583 (1941); *Carpenter v. Wabash Ry.,* 309 U.S. 23, 27, 60 S.Ct. 416, 418, 84 L.Ed. 558, 561 (1940); *Duplex Printing Press Co. v. Deering,* 254 U.S. 443, 464, 41 S.Ct. 172, 175, 65 L.Ed. 349, 355 (1921). The Government in the Sunshine Act, of which the amendment was a part, became effective 180 days after passage—on March 12, 1977. Pub.L. No. 94–409, § 6(a), 90 Stat. 1248.

**21.** Export Administration Act of 1969, § 14, as amended, 50 U.S.C.App. § 2413 (Supp. V 1975).

**22.** Exec. Order No. 11940, 3 C.F.R. 150 (1977).

**23.** Export Administration Amendments of 1977, Pub.L. No. 95–52, Tit. II, § 201(a), 91 Stat. 244 (1977), 50 U.S.C.A.App. § 2403–1a (Supp. Sept. 1977).

Worth mentioning, though without direct bearing on the issues before us, is that as long as the Secretary was operating under the aegis of the Executive Order he was under direction to make available for public inspection all "boycott-related reports" filed after October 7, 1976. President Gerald R. Ford, Memorandum for the Secretary of Commerce, 41 Fed.Reg. 44862 (1976). A similar—and similarly prospective—adjuration was incorporated in the reborn statute. Export Administration Amendments of 1977, Pub.L. No. 95–52, § 201(a), 91

Stat. 246 (1977). Both the executive memorandum and the statutory amendments provided that certain kinds of proprietary information might be kept confidential if, in the words of the statute, "the Secretary determines that disclosure thereof would place the United States person involved at a competitive disadvantage." Export Administration Amendments of 1977, Pub.L. No. 95–52, § 201(a), 91 Stat. 246 (1977). *Cf.* President Gerald R. Ford, Memorandum, *supra,* 41 Fed.Reg. 44862; 15 C.F.R. § 369.4(a) (1977). Thus all reports of the sort here in controversy that were filed after October 7, 1976, are available to the public regardless of the outcome of this case.

**24.** 5 U.S.C. § 552(b)(3) (1976), quoted in text *infra* at note 30.

**25.** 5 U.S.C. § 552(b)(3) (1970) provided that the disclosure requirement of the Freedom of Information Act "[did] not apply to matters that [were] . . . (3) specifically exempted from disclosure by statute."

**26.** *Administrator v. Robertson, supra* note 15, 422 U.S. at 266, 95 S.Ct. at 2148, 45 L.Ed.2d at 173.

**27.** The statute, 49 U.S.C. § 1504 (1970), provides that upon the objection of "[a]ny person" the appropriate officials "shall order such information withheld from public disclosure when, in their judgment, a disclosure of such information would adversely affect the interests of such person and is not required in the interest of the public."

gree of discretion on what information is to be protected."[28]

The legislative response was a narrowing of Exemption 3 to exclude from its compass laws such as that in *Robertson,* which Congress perceived as giving the agency *"cart blanche* to withhold any information [it] pleases."[29] Congress did not, however, itself undertake to sort out those nondisclosure statutes that it comprehended as remaining within the exemption from those that it intended to exclude. Instead, it left that task for the courts by amending Exemption 3 so that material would be deemed "specifically exempted from disclosure by statute" only if the "statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld."[30]

The legislative history of the amendment leaves no doubt that Exemption 3's two subsections are separate and distinct.[31] Subsection (A), on its face, is too rigorous to tolerate any decisionmaking on the administrative level. It embraces only those statutes incorporating a congressional mandate of confidentiality that, however general,[32] is "absolute and without exception."[33] Subsection (B) does leave room for administrative discretion in two carefully defined situations, but its unmistakable thrust, like that of Subsection (A), is to assure that basic policy decisions on governmental secrecy be made by the Legislative rather than the Executive branch.[34] To include within its sweep provisions reflecting no more than a vague apprehension that an agency might someday fall heir to sensitive information is obviously to frustrate that policy. Nondisclosure is countenanced by Subsection (B) if, but only if, the enactment is the product of congressional appreciation of the dangers inherent in airing particular data and incorporates a formula whereby the administrator may determine precisely whether disclosure in any

**28.** *Administrator v. Robertson, supra* note 15, 422 U.S. at 266, 95 S.Ct. at 2148, 45 L.Ed.2d at 174.

**29.** H.R.Rep.No. 880, pt. I, 94th Cong., 2d Sess. at 23 (1976); U.S.Code Cong. & Admin.News 1976, pp. 2183, 2205.

**30.** Government in the Sunshine Act, Pub.L. No. 94–409, § 5(b), 90 Stat. 1247 (1976), 5 U.S.C. § 552(b)(3) (1976).

**31.** See 122 Cong.Rec. H7897 (daily ed. July 28, 1976) (colloquy between Representatives McCloskey and Fascell). See note 33 *infra.*

**32.** See 122 Cong.Rec. H9260 (daily ed. Aug. 31, 1976) (remarks of Representative Brooks); H7897 (daily ed. July 28, 1976) (remarks of Representative McCloskey).

**33.** 122 Cong.Rec. H9260 (daily ed. Aug. 31, 1976) (remarks of Representative Abzug). As reported from the House Committee on Government Operations, the language of the proposed amendment was "(3) required to be withheld from the public by any statute establishing particular criteria or referring to particular types of information." H.R.Rep.No. 880, pt. I, *supra* note 29, at 25. It was then referred to the House Committee on the Judiciary, which revised it to read "(3) required *or permitted* to be withheld from the public" in order to alter what was considered "an unwise attempt to reverse . . . *Robertson.*" 122 Cong. Rec. H7873 (daily ed. July 28, 1976) (remarks of Representative Moorhead). See H.R. Rep.No. 880, pt. II, 94th Cong., 2d Sess. 1, 7, 25 (1976). On the House floor, however, it was again amended, partly to "undo the Robertson case decision," 122 Cong.Rec. H7897 (daily ed. July 28, 1976), (remarks of Representative Fascell), and partly to make clear that statutes mandating confidentiality would qualify under Exemption 3 even if they "did not say particular classes of information or particular criteria. . . ." *Id.* In conference, the language "in such a manner as to leave no discretion on the issue" was added to "clarif[y]" the intent that "statutes lacking specific criteria" would be encompassed in the exemption "only if their withholding requirement is absolute and without exception." 122 Cong.Rec. H9260 (daily ed. Aug. 31, 1976) (remarks of Representative Abzug). H.R.Rep.No. 1441, *supra* note 19, at 8.

**34.** See H.R.Rep.No. 880, pt. I, *supra* note 9, at 23. A central aim of the Freedom of Information Act has been to substitute legislative judgment for administrative discretion. See, *e. g.,* S.Rep.No. 813, 89th Cong., 2d Sess. 3–6 (1965). *Cf. Department of Air Force v. Rose,* 425 U.S. 352, 360–361, 96 S.Ct. 1592, 1599–1600, 48 L.Ed.2d 11, 20–21 (1976); *EPA v. Mink,* 410 U.S. 73, 79–80, 93 S.Ct. 827, 832, 35 L.Ed.2d 119, 127–128 (1973).

instance would pose the hazard that Congress foresaw.

Decisions as to whether given "criteria" or enumerated "types of matters" are sufficiently "particular[ized]" [35] in any statute to represent such a congressional judgment necessarily implicate a measure of subjectivity. Congress did, however, leave some clues to the measure it contemplated, for it gave examples of provisions that it concluded would or would not fall within the amended exemption.[36] These touchstones leave no doubt but that statutes like that involved in *Robertson* —which, because they set forth benchmarks for secrecy so general as the "interest of the public," [37] in fact delegate to administrators the entire burden of identifying the problems disclosure might generate—do not satisfy Subsection (B)'s requirement that Congress have articulated "particular criteria." [38] When, on the other hand, Congress has made plain its concern with a specific effect of publicity—as when in the Atomic Energy Act of 1954 it directed that information be released only if it "can be published without undue risk to the common defense and security" [39]—Exemption 3 is to honor that concern.[40] Similarly, to fall within the definition of a "statute . . '. [that] refers to particular types of matters to be withheld," [41] the "Congressional English" [42] must be more exact than that in a section of the Social Security Act which purports to forbid disclosure "of any [tax] return . . , or of any file, record, report or other paper, or any information . . ., except as [the agency] . . . may by regulations prescribe." [43] These and other examples imply a congressional sense that the crucial distinction lay between statutes that in some manner *told* the official what to do about disclosure and those that did not significantly inform his discretion in that regard.

**35.** See text *supra* at note 30.

**36.** See, *e. g.,* H.R.Rep.No. 1441, *supra* note 19, at 25; H.R.Rep. 880, pt. I, *supra* note 29, at 23; 122 Cong.Rec. H9260 (daily ed. Aug. 31, 1976) (remarks of Representative Abzug); 122 Cong. Rec. H7897 (daily ed. July 28, 1976) (remarks of Representative McCloskey). See also *Seymour v. Barabba,* 182 U.S.App.D.C. 185, 187, 559 F.2d 806, 808 (1977); *Phillippi v. CIA,* 178 U.S. App.D.C. 243, 249 n. 14, 546 F.2d 1009, 1015 n. 14 (1976). Since the conclusions in the conference report were commended to the entire Congress, they carry greater weight than other of the legislative history. *Cf. Department of Air Force v. Rose, supra* note 34, 425 U.S. at 366, 96 S.Ct. at 1603, 48 L.Ed.2d at 24, quoting *Vaughn v. Rosen,* 173 U.S.App.D.C. 187, 193–194, 523 F.2d 1136, 1142–1143 (1975), quoting in turn K. Davis, Administrative Law Treatise § 3A.31 at 175 (1970 Supp.). But, as noted *supra* note 33, the bill as reported out of the House Committee on Government Operations closely resembled the enacted version—at least insofar as Subsection (B) is concerned. So the report of that committee—H.R.Rep.No. 880, pt. I, *supra* note 29—is not an inappropriate tool for divination of the interest of the Congress as a whole, especially since each House had an opportunity to object to interpretation contained in that report.

**37.** See note 27 *supra.*

**38.** See H.R.Rep.No. 1441, *supra* note 19, at 25; H.R.Rep.No. 880, pt. I, *supra* note 29, at 23; 122 Cong.Rec. H7897 (daily ed. July 28, 1976)

(exchange between Representatives McCloskey and Fascell).

**39.** Atomic Energy Act of 1954, § 142(a), 42 U.S.C. § 2162(a) (1970).

**40.** See H.R.Rep.No. 880, pt. I, *supra* note 29, at 23.

**41.** See text *supra* at note 30.

**42.** *Briggs v. Goodwin,* 186 U.S.App.D.C. 170, 173, 569 F.2d 1, 4 (1977), quoting *Henderson v. Flemming,* 283 F.2d 882, 885 (5th Cir. 1960).

**43.** Social Security Act, tit. XI, § 1106, as amended, 42 U.S.C. § 1306(a) (1970), cited with disapprobation in H.R.Rep.No. 1441, *supra* note 19, at 25. Compare 2 U.S.C. § 437g(a)(3) (Supp. V 1975) and 42 U.S.C. §§ 2000e–5(b), 2000e–8(e) (Supp. V 1975), which require the respective agencies to withhold "certain information relating to informal conciliation and enforcement efforts," H.R.Rep.No. 880, pt. I, *supra* note 29, at 23; U.S.Code Cong. & Admin. News 1976, p. 2205, and 49 U.S.C. § 1461 (1970), which prohibits publication of Civil Aeronautics Board decisions on foreign air route applications before they are submitted to the President. These provisions were cited with approval in H.R.Rep.No. 880, pt. I, *supra* note 29, at 23; U.S.Code Cong. & Admin.News 1976, p. 2205 as "[e]xamples of statutes that could justify withholding under the amended exemption (3) . . . ."

Our recent application of amended Exemption 3 in *Seymour v. Barabba*[44] illustrates this distinction. There we held that legislation prohibiting use of any "information furnished under [the census laws] for any purpose other than the statistical purposes for which it is supplied"[45] satisfied the exemption's strictures. Noting that Congress had several times specifically considered the issue of the confidentiality of census data,[46] we concluded that the statute delimited narrowly enough the form in which they might be opened to public view.[47] This amount of attention to the problem and this degree of precision in addressing it convinced us that Congress had itself made the basic decision, and had left to the administrator only the task of implementation.[48]

IV

Applying these standards to Section 7(c) of the Export Administration Act,[49] we find it wanting as a barrier under amended Exemption 3 of the Freedom of Information Act to the data which appellants seek. Its very terms belie any contention that it "leave[s] no discretion on the issue"[50] of disclosure, as required by Subsection (A), for it expressly undertakes to commit to departmental and agency heads the determination of whether "the withholding" of the information "is contrary to the national interest."[51] Nor is the exemption called into play by reason of Subsection (B). To be sure, were the only "matters" to which Section 7(c) "refer[red]"[52] the boycott-request reports at issue here, a plausible argument might be made that the congressional directive it incorporated was sufficiently well honed to summon the exemption's protections. As it is, however, Section 7(c) applies to any and all "information obtained" under any portion of the enact-

44. *Supra* note 36.

45. 13 U.S.C. § 9(a) (1970).

46. *Seymour v. Barabba, supra* note 36, 182 U.S.App.D.C. at 187–188, 559 F.2d at 808–809.

47. Id. at 187, 559 F.2d at 808. We said:
We think that this statute is a clear and strongly worded prohibition against disclosure which would qualify under Exemption 3. It is a flat barrier to disclosure with no exercise of discretion permitted. It refers to the particular type of matter to be withheld, using rather all-embracing language for the description to be sure, but emphatically including "the information furnished under the provisions of this Title" and forbidding its use "for any purpose other than the statistical purposes for which it is supplied."
*Id.* at 186–187, 559 F.2d at 807–808.

48. *Id. Cf. Kruh v. GSA,* 421 F.Supp. 965, 967 (E.D.N.Y.1976).

49. See text *supra* at note 12 and note 23 *supra.*

50. 5 U.S.C. § 552(b)(3)(A) (1976), quoted in text *supra* at note 30. If there could be any doubt about the existence of substantial administrative discretion under § 7(c), the legislative history puts it to rest. Section 7(c) was first enacted as part of the Export Control Act of 1949, Pub.L. No. 81–11, § 6(c), 63 Stat. 8–9 (1949), and was imported without change into the Export Administration Act of 1969. Its vaguely-expressed purpose seems to have been to aid in the detection of violations of substan-

tive provisions of the 1949 Act. See S.Rep.No. 31, 81st Cong., 1st Sess. 6 (1949); 95 Cong.Rec. 438 (1949) (statement of Senator Maybank). Such debate as touched on it centered not on the inclusion in the bill of what Representative Wolcott called a "snooping clause," 95 Cong. Rec. 1379 (1949), but on the lack of standards. See 95 Cong.Rec. 1368 (1949), (remarks of Representative Brown); *id.* at 1379 (remarks of Representative Wolcott); *id.* at 1386 (remarks of Representative Hale); *id.* at 1396 (exchange between Representatives Wolcott and Buchanan). Indeed, on the floor of the House an amendment was offered that would have made nondisclosure mandatory rather than "wholly within the discretion of" the administering agency. 95 Cong.Rec. 1396 (1949) (remarks of Representative Wolcott). The sole statement in defense of the section as it stood was that certain of its language—"unless [the agency] determines that the withholding thereof is contrary to the national interest"—"qualifies the [rest of the Section] and clarifies it. The experience of the Department in carrying out [previous export control acts] indicates that language of this character is essential." 95 Cong.Rec. 1396 (1949) (remarks of Representative Buchanan). The proposed amendment was defeated by less than a score of votes. 95 Cong. Rec. 1396 (1949).

51. See text *supra* at note 12.

52. See text *supra* at note 30.

ment of which it is a part.[53] The Export Administration Act contains numerous provisions authorizing the collection of data,[54] perhaps the broadest being the power to require exporters to keep such records and submit such reports as are "necessary or appropriate to the enforcement of this Act . . . or to the imposition of any penalty, forfeiture, or liability . . . ."[55] This general applicability to anything that might happen to be encompassed within this array of information-gathering functions undermines any notion that Section 7(c) represents a congressional determination of the advisability of secrecy for any "particular type[ ] of matter[ ],"[56] if for no other reason than that the agency had the power radically to expand the quantity and diversity of information in its files to intercept matter of a sort that Congress well might not have contemplated when considering the need for confidentiality.[57]

There remains the question whether Section 7(c)'s incorporation of the "national interest" as a yardstick for disclosure [58] suffices to satisfy Subsection (B)'s requirement of "particular criteria for withholding." [59] We believe the answer to this lies in Congress' specific disapproval [60] of the Supreme Court's decision in *Robertson*.[61] As noted earlier, the "public interest" standard specified in the statute there involved was thought to give the agency "*cart blanche*" [62] —precisely the kind of situation that Exemption 3 was amended to avoid.[63] Perhaps there is a metaphysical distinction between the "public interest" and the "national interest," but such a difference would not warrant dissimilar treatment under the Freedom of Information Act.[64]

---

**53.** See text *supra* at note 30.

**54.** See, *e. g.*, 50 U.S.C.App. § 2403(b)(2) (1970) (empowering an investigation into the advisability of decontrolling certain articles); 50 U.S.C.App. § 2404(a) (1970) (requirement to "seek information and advice" from other departments of the Government and from "private industry"); 50 U.S.C.App. § 2404(b)(2) (Supp. V 1975) (requiring solicitation of comments on any quantitative restrictions on exports); 50 U.S.C.App. § 2404(c)(2) (Supp. V 1975) (requiring technical advisory committees to "advise and assist"); 50 U.S.C.App. § 2406(a) (1970) (subpoena power).

**55.** 50 U.S.C.App. § 2406(a) (1970).

**56.** See text *supra* at note 30.

**57.** In this respect § 7(c), when read in concert with the rest of the Export Administration Act, may be seen to compare quite closely with § 1106 of the Social Security Act, 42 U.S.C. § 1306(a) (1970), discussed in text *supra* at note 43, which Congress suggested would not satisfy amended Exemption 3. H.R.Rep.No. 1441, *supra* note 19, at 25.

**58.** See text *supra* at note 12.

**59.** See text *supra* at note 30.

**60.** See notes 25–30 *supra* and accompanying text.

**61.** See text *supra* at notes 18–20 and Part III *supra*.

**62.** See text *supra* at note 29.

**63.** See notes 29–30 *supra* and accompanying text.

**64.** One might be inclined to argue that the readoption of § 7(c) in 1977, see text *supra* at notes 21–23, reflects a congressional understanding that the section was within the scope of amended Exemption 3. We think the relevant legislative history forecloses that conclusion.

During its consideration of the bills forerunning the 1977 enactment, the House Committee on International Relations addressed a contention by the Department of Commerce that, in view of the reframing of Exemption 3 in 1976, "it is necessary to specify the types of information with respect to which confidentiality must be maintained." H.R.Rep.No. 95–190, 95th Cong., 1st Sess. 18 (1977); U.S.Code Cong. & Admin.News 1977, p. 1155. The Committee declined to do so, stating:

The committee finds the list of types of information proposed by the Department for confidential treatment to be virtually all-inclusive, and actually to expand the secrecy provisions of the act, rather than reduce them as is the intent of the committee. It is not the intent of the committee to require disclosure of trade secrets and commercial and financial information which is legitimately confidential or the public release of which could cause competitive harm or the disclosure of intraagency, interagency, or intergovernmental deliberations with respect to which secrecy is truly necessary on the grounds of national defense, foreign policy, or business confidentiality. The committee considers the various exemptions granted by the Freedom of Information Act, together with the existing provi-

We hold, then, that Section 7(c) does not immunize the information in controversy from disclosure prompted by a request under the Freedom of Information Act.[65] That does not mean, of course, that some of the information sought here might not be exempt from revelation under other exemptions specified in that Act[66]—a matter on which we intimate no view. We reverse the judgment of the District Court and remand the case to it for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

sions of section 7(c) of the act, to be adequate for the protection of such information. *Id.* The Commission also rejected a similar suggestion by the Department that data gathered before the effective date of amended Exemption 3—the type of information in controversy here—be given unqualified protection from disclosure:

> For the same reason, the committee does not accept the Department's argument that it is necessary to grant a blanket exemption from the provisions of the Freedom of Information Act with respect to all information received by the Department before the effective date of the Government in the Sunshine Act. Any such information which is legitimately confidential is, in the opinion of the committee, adequately protected by the exemptions of the Freedom of Information Act and section 7(c) of the Export Administration Act.

*Id.*

A claim that, whatever its status before 1977, § 7(c) is by reason of the Committee's statements now an Exemption 3 statute, may be initially beguiling. But closer examination reveals—quite satisfactorily, we think—that by no means were the statements intended to have that effect. First, there is the Committee's professed purpose to curtail rather than enlarge "secrecy provisions" in the Export Administration Act, a predisposition at war with any notion that § 7(c) was to enjoy an expansive role. Indeed, there is also the Committee's flat refusal to confer "a blanket exemption" upon previously-collected material, which is precisely what § 7(c) would do if it fell within the ambit of Exemption 3. There is, too, the fact that the kinds of information that the Committee overtly deemed confidential—trade secrets, commercial and financial information, and intraagency, interagency and intergovernmental deliberations—all were already protected by one or another of the exemptions to the Freedom of Information Act, see 5 U.S.C. § 552(b)(4), (5) (1976). The Committee's reliance on Freedom-of-Information-Act exemptions other than Exemption 3 is a convincing indication that § 7(c) is not to be considered an Exemption 3 statute, since if it were it would itself—without assistance from any other source—shield from disclosure every bit of information obtained under the Export Information Act. Lastly, we remain mindful that, save as affected by exemptions other than Exemption 3 to the Freedom of Information Act, the Committee lifted the veil of secrecy prospectively for § 7(c), material, see note 23 *supra,* and in no wise intimated an opinion that information already in hand is to be treated differently, as one might expect had the Committee entertained that view.

These peculiarities persuade us that the Committee, preoccupied as it was with unacceptable suggestions from the Department of Commerce, was not undertaking to overhaul § 7(c), but was content to leave demands for disclosure of material assembled thereunder wholly to the dictates of the Freedom of Information Act. This does not mean, of course, that such material is freely releasable, for particular portions may well be intercepted by exemptions to the Freedom of Information Act other than Exemption 3. Nor does it strip § 7(c) of any mission of its own. To the extent that disclosure is not mandated by a proper Freedom-of-Information-Act request, § 7(c) stands as a bar to voluntary administrative divulgence without the required determination "that the withholding thereof is contrary to the national interest." See text at note 12 *supra.* Compare *Charles River Park "A", Inc. v. HUD,* 171 U.S.App.D.C. 286, 291–294, 519 F.2d 935, 940–943 (1975).

**65.** After submission of the case on appeal, the contrary holding in *Green v. Department of Commerce,* Civ. No. 77–363 (D.D.C. Nov. 15, 1977), was announced. It suffices to say that, for the reasons articulated herein, we find ourselves in respectful disagreement with that decision.

**66.** See note 64 *supra.*