**WISCONSIN PROJECT ON NUCLEAR ARMS CONTROL, Appellant,**

v.

**UNITED STATES DEPARTMENT OF COMMERCE, Appellee.**

**No. 01–5356.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 7, 2002.

Decided Jan. 31, 2003.

Scott L. Nelson argued the cause for appellant. With him on the briefs was David C. Vladeck. Alan B. Morrison entered an appearance.

Steve Frank, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were Roscoe C. Howard, Jr., U.S. Attorney, and Leonard Schaitman, Attorney.

Eric L. Hirschhorn, Anne W. Stukes, Janice S. Amundson, and Quentin Riegel were on the brief for amici curiae Industry Coalition on Technology Transfer, et al., in support of appellee.

Before: RANDOLPH and ROGERS, Circuit Judges, and WILLIAMS, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge ROGERS.

Dissenting opinion filed by Circuit Judge RANDOLPH.

ROGERS, Circuit Judge:

The principal question on appeal is whether Exemption 3 of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(3) (2000), permits the Department of Commerce to withhold from public disclosure information contained in export license applications. This determination requires the court to address the nature of the reference in FOIA Exemption 3 to statutes allowing documents to be withheld. Under the Export Administration Act, 50 U.S.C. app. §§ 2401–20 (2000), which from time to time has been enacted as temporary legislation, manufacturers of dual-use commodities — that is, products that can be used for both military and civilian purposes — must obtain a license from the Department before they may export their products. The Wisconsin Project on Nuclear Arms Control ("the Wisconsin Project") requested access under FOIA to these export license applications. The Department responded by providing aggregate data while declining, under Exemption 3, to supply much of the requested specific export data. In light of the unique statutory framework created by Congress to retain the confidentiality of export data, we affirm the grant of summary judgment to the Department.

## I.

The Export Administration Act ("EAA") authorizes the Department of Commerce to establish a regulatory scheme governing the export of dual-use items. 50 U.S.C. app. §§ 2401–20. The Department accordingly promulgated the Export Administration Regulations ("export regulations"), which set forth exporters' obligations and specify the types of products that are subject to the EAA's requirements. 15 C.F.R. §§ 730–74 (2002). Section 12(c) of the EAA provides that "information obtained for the purpose of consideration of, or concerning, license applications under this Act shall be withheld from public disclosure unless the release of such information is determined by the Secretary [of Commerce] to be in the national interest." 50 U.S.C. app. § 2411(c). The Department has incorporated this confidentiality provision into the export regulations. 15 C.F.R. pt. 736, supp. 2 (2002).

Congress originally enacted the export control system as part of the Export Control Act of 1949, Pub.L. 81–11, § 6(c), 63 Stat. 7, 8–9, and subsequently replaced it with the Export Administration Act of 1969, Pub.L. 91–184, § 7(c), 83 Stat. 841, 845. Congress has enacted each version of the statute as a temporary measure, explaining that "such important regulatory legislation should be periodically reviewed." H.R.Rep. No. 95–459, at 13 (1977). From time to time, however, Congress has amended the EAA to reinstate its provisions and on each occasion has included a sunset provision specifying the date on which the EAA will expire. 50 U.S.C. app. § 2419 (2000). The current version of the statute — the EAA of 1979 — has lapsed six times, for periods ranging from as short as five days to as long as six years. Each time the EAA has expired, the President has promptly declared a national emergency and has extended the regulatory scheme by executive order. See, e.g., Exec. Order No. 13,222, 2001 WL 943862, 3 C.F.R. 783 (2002); Exec. Order No. 12,867, 1993 WL 388306 3 C.F.R. 649 (1994); Exec. Order No. 12,730, 1990 WL 385147, 3 C.F.R. 305 (1991); Exec. Order No. 12,470, 1984 WL 87931, 3 C.F.R. 168 (1985); Exec. Order No. 12,444, 1983 WL 85344, 3 C.F.R. 214 (1984); Exec. Order No. 11,940, 1976 WL 21343, 3 C.F.R. 150 (1977).

Originally the President relied on a provision in the Trading with the Enemy Act ("TWEA"), 50 U.S.C. app. § 5(b) (2000), for authorization to continue the export control system during lapses in the EAA. In 1977, however, Congress reformed the TWEA by enacting the International Emergency Economic Powers Act ("IEEPA") and provided that the President, upon declaration of a national emergency, may "regulate . . . prevent or prohibit . . . importation or exportation of . . . any property in which any foreign country or a national thereof has any interest . . . by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1) (2000). In enacting IEEPA, Congress reaffirmed the President's regulatory control over exports by broadening the scope of the EAA to include regulation of extraterritorial exports. Pub.L. No. 95–223, § 301, 91 Stat. 1625, 1629 (codified as amended at 50 U.S.C. app. §§ 2402–03 (2000)). IEEPA's legislative history, moreover, indicates that Congress intended the President to use his authority under IEEPA "to continue the Export Administration Regulations in effect" should a "lapse" occur in the EAA. H.R.Rep. No. 95–459, at 13 (1977). (No Conference Report exists, and the Senate Report is silent on this point.)

The EAA of 1979 expired by its terms in 1994, and the President, pursuant to IEEPA, again extended the export controls by Executive Order. The President declared

that the EAA's expiration posed "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and constituted a national emergency. Exec. Order No. 12,-924, 59 Fed.Reg. 43,437, 1994 WL 450440 (Aug. 19, 1994), *reprinted in* 50 U.S.C. § 1701 (2000). The President ordered that the EAA's provisions "be carried out under this order so as to continue in full force and effect...." *Id.*

On July 27, 1999, during the period when the EAA had lapsed, the Wisconsin Project submitted a request under FOIA to the Department for "records of all license applications for dual-use commodities that the U.S. Department of Commerce approved, denied, suspended, or returned without action, for export to the People's Republic of China (including Hong Kong), India, Israel, Pakistan, and Russia, for the period beginning January 1, 1995 and extending to the present." The request stated that it included "information showing the federal agencies to which each license application was referred for review, ... each agency's recommendation on the application referred, ... the applicant, the case number, the date received, the final date, the consignee-end user, the [Export Control Classification Number], the value and the statement of end use." The Department responded by letter dated August 24, 1999, turning over reports showing aggregate data for the specified countries while stating that the more detailed information was exempt from disclosure under FOIA Exemption 3.

After exhausting its administrative remedies, the Wisconsin Project sued in the district court for release of the detailed export information. While the lawsuit was pending, Congress reenacted the EAA, extending its expiration date from August 20, 1994, to August 20, 2001. Pub.L. 106–508, 114 Stat. 2360 (2000) (codified at 50 U.S.C.

app. § 2419). Before the district court ruled on the Department's motion for summary judgment, the August 2001 expiration date passed, and the President once more extended the EAA's export controls by Executive Order. Exec. Order No. 13,-222, 3 C.F.R. 783 (2002). The district court granted the Department's motion on September 4, 2001. Citing statements by Members of Congress and the President, the district court concluded that Congress's amendment of the EAA in 2000 made clear that the EAA covered the time period when the Wisconsin Project's request for records was pending before the Department, and it ruled that the amended EAA did not constitute an unconstitutional retroactive application of a new statute to prior conduct.

## II.

■ The purpose of the Freedom of Information Act is " 'to pierce the veil of administrative secrecy and open agency action to the light of public scrutiny....' " *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976) (citation omitted). FOIA embodies " 'a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language.' " *Id.* at 360–61, 96 S.Ct. at 1599 (quoting S.Rep. No. 813, 89th Cong., 1st Sess., 3 (1965)). FOIA accordingly mandates a "strong presumption in favor of disclosure," *United States Dep't of State v. Ray*, 502 U.S. 164, 173, 112 S.Ct. 541, 547, 116 L.Ed.2d 526 (1991), under which the statutory exemptions to disclosure are to be "narrowly construed," *Rose*, 425 U.S. at 361, 96 S.Ct. at 1599. The exemptions, however, are to be given "meaningful reach and application." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152, 110 S.Ct. 471, 475, 107 L.Ed.2d 462 (1989). In reviewing *de novo* a grant of summary judgment for the government in a FOIA

case, the court remains particularly "mindful that the 'burden is on the agency' to show that requested material falls within a FOIA exemption." *Petroleum Info. Corp. v. United States Dep't of the Interior*, 976 F.2d 1429, 1433 (D.C.Cir.1992).

■ Exemption 3 takes literally the requirement that disclosure prevail absent "clearly delineated statutory language," *Rose*, 425 U.S. at 361, 96 S.Ct. at 1599. Under Exemption 3, agencies may withhold information "specifically exempted from disclosure by statute ... provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). To qualify as a withholding provision, a statute must be "the product of congressional appreciation of the dangers inherent in airing particular data" and must "incorporate[ ] a formula whereby the administrator may determine precisely whether the disclosure in any instance would pose the hazard that Congress foresaw." *Am. Jewish Cong. v. Kreps*, 574 F.2d 624, 628–29 (D.C.Cir. 1978). In short, "only explicit nondisclosure statutes that evidence a congressional determination that certain materials ought to be kept in confidence will be sufficient to qualify under the exemption." *Irons & Sears v. Dann*, 606 F.2d 1215, 1220 (D.C.Cir.1979).

■ Exemption 3 has evolved from its original text to require that Congress, not the agencies of the Executive Branch, determine the need for nondisclosure. Congress amended Exemption 3 in 1976 in response to the Supreme Court's decision in *Administrator, FAA v. Robertson*, 422 U.S. 255, 266–67, 95 S.Ct. 2140, 2147–48, 45 L.Ed.2d 164 (1975), which held that § 1104 of the Federal Aviation Act of 1958 ("FAA"), 49 U.S.C. § 1504 (2000), consti-

tuted an Exemption 3 withholding statute. The FAA authorized the Administrator to withhold information from public disclosure "when, in [the Administrator's] judgment, a disclosure of such information ... is not required in the interest of the public." *Robertson*, 422 U.S. at 257 n. 4, 95 S.Ct. at 2144 n. 4. Concerned that *Robertson* "afford[ed] the FAA Administrator cart[e] blanche to withhold any information he please[d]," Congress overruled the decision and narrowed Exemption 3 by adding subsections (A) and (B). H.R.Rep. No. 94–880, pt. 1, at 23 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2183, 2204–05 ("H.R.Rep. No. 94–880"). As this court has explained:

> The amended text and its legislative history make clear that Congress did not want the exemption to be triggered by every statute that in any way gives administrators discretion to withhold documents from the public. On the contrary, Congress intended exemption from the FOIA to be a legislative determination and not an administrative one.

*Irons & Sears*, 606 F.2d at 1220 (footnote omitted). A statute qualifies as a withholding statute under Exemption 3, then, where "Congress ha[s] itself made the basic decision, and ha[s] left to the administrator only the task of implementation." *Am. Jewish Cong.*, 574 F.2d at 630.

This court has previously considered the application of Exemption 3 to the EAA. In 1978, in *American Jewish Congress v. Kreps*, the court held that the disclosure provision of the EAA of 1969 did not specify the types of matters to be withheld with sufficient particularity. 574 F.2d at 630–31. The court explained that Congress, in amending Exemption 3, clarified that statutes that merely "set forth benchmarks for secrecy so general as the 'interest of the public' " (such as the statute at issue in *Robertson*) do not satisfy subsection (B)'s

"particular criteria" requirement. *Id.* at 629. "When, on the other hand, Congress has made plain its concern with a specific effect of publicity . . . Exemption 3 is to honor that concern." *Id.* Because the nondisclosure provision in the EAA of 1969 referred only to "information obtained" under the Act, *id.* at 626, the court concluded that the statutory language was too broad to justify withholding information under Exemption 3, *id.* at 631. The court, in light of the EAA's lapse in 1976, had no occasion to reach "the thorny question whether material that, when submitted, was 'specifically exempted from disclosure by statute' lost its exemption once the statute went into remission." *Id.* (footnote omitted).

Following the court's decision in *American Jewish Congress,* Congress enacted the EAA of 1979 and amended the statute's nondisclosure provision. Pub.L. 96–72, § 12(c), 93 Stat. 503, 531 (1979) (codified as amended at 50 U.S.C. app. § 2411(c)). Section 12(c) now specifies the particular types of matters to be withheld — namely, "information obtained for the purpose of consideration of, or concerning, license applications under this Act. . . ." 50 U.S.C. app. § 2411(c). Thus, we have little difficulty concluding that section 12(c) qualifies as an Exemption 3 statute. *Times Publ'g Co. v. United States Dep't of Commerce,* 236 F.3d 1286, 1290 (11th Cir.2001); *Lessner v. United States Dep't of Commerce,* 827 F.2d 1333, 1337 (9th Cir.1987) (per curiam); *Durnan v. United States Dep't of Commerce,* 777 F.Supp. 965, 966 (D.D.C.1991). As a result, the "thorny question" to be addressed here is whether the Department may withhold export application data submitted during a period of lapse in the EAA, the mirror image of the "thorny question" in *American Jewish Congress.*

██ The Wisconsin Project contends that the Department may not withhold the data, and the logic of its argument is simple: Exemption 3, by its text, requires that a withholding "statute" be in place; because the EAA was not in effect either when the exporters submitted their application data to the Department or when the Wisconsin Project requested that data from the Department under FOIA, no statute exists to justify the Department's withholding of the requested data. The Wisconsin Project's formalistic logic, however, misses the bigger picture. As the foregoing discussion of this circuit's precedents indicates, the touchstone of the Exemption 3 inquiry is whether the statute "is the product of congressional appreciation of the dangers inherent in airing particular data and incorporates a formula whereby the administrator may determine precisely whether disclosure in any instance would pose the hazard that Congress foresaw." *Am. Jewish Cong.,* 574 F.2d at 628–29.

Congress's actions throughout the long history of the EAA evince a clear appreciation of the dangers inherent in exposing export application data to public view. Since it was first enacted by Congress, the EAA has always contained a confidentiality provision that permits the Department to withhold export application data. *See* 50 U.S.C. app. § 2411(c); EAA of 1969, Pub.L. 91–184, § 7(c), 83 Stat. 841, 845; Export Control Act of 1949, Pub.L. 81–11, § 6(c), 63 Stat. 7, 8–9. In 1977, as Congress prepared to renew the EAA's provisions, the Department urged Congress "to grant a blanket exemption from the provisions of the Freedom of Information Act with respect to all information" submitted under the EAA. H.R.Rep. No. 95–190, at 18 (1977), *reprinted in* 1977 U.S.C.C.A.N. 362, 379. Declining the invitation, the House International Relations Committee explained that "[a]ny such information which is legitimately confidential is, in the opinion of the committee, adequately pro-

tected by the exemptions of the Freedom Information Act and section 7(c) of the Export Administration Act." *Id.* Congress reaffirmed this view two years later when, in enacting the EAA of 1979, it replaced section 7(c) with an amended section 12(c) in order to protect the export data from disclosure under the court's opinion in *American Jewish Congress.* Pub.L. 96–72, § 12(c), 93 Stat. 503, 531 (1979) (codified as amended at 50 U.S.C. app. § 2411(c)).

The legislative history indicates that Congress intended to preserve these confidentiality protections when it renewed the EAA in November 2000. In commenting on the original House version of the 2000 bill, Representative Gilman noted that "the Department is ... currently defending against two separate lawsuits seeking public release of export licensing information," and he explained that the bill would "make sure that [the Department] can keep the information confidential...." 146 Cong. Rec. H8022 (daily ed. Sept. 25, 2000). Senator Gramm, commenting on the final version of the legislation, stated that the statute "will make clear that [the Department's] authority to apply the 12(c) confidentiality provision of the 1979 act is to be considered as covering any information regarding license applications obtained during that time period, as if there had been no interruption of authority." 146 Cong. Rec. S11365 (daily ed. Oct. 30, 2000). The Wisconsin Project rightly notes that the legislative history is not entirely uniform on this point. Representative Gilman, for example, indicated that the bill's final language left him uncertain whether the amendment would clearly protect all information submitted between 1994 and 2000 from disclosure. 146 Cong. Rec. H11575–76 (daily ed. Oct. 30, 2000). But regardless of whether every Member of Congress agreed on the amendment's effect, the Members determined that the confidentiality provision is important to the function-

ing of the export control system; otherwise they would not have included it as part of the renewed EAA. And that determination is the touchstone of this circuit's Exemption 3 inquiry. *Irons & Sears,* 606 F.2d at 1220.

The Wisconsin Project fails to acknowledge that the EAA is not the only statute that reflects Congress's determination regarding the confidentiality of export application information. Congress enacted IEEPA out of concern that export controls remain in place without interruption, and the accompanying Report of the House International Relations Committee included the following statement:

> The committee rejected administration recommendations that it make the Export Administration Act permanent legislation, because it feels that such important regulatory legislation should be periodically reviewed.... Should a lapse [in the EAA] occur, however, the authority of [IEEPA] could be used to continue the Export Administration Regulations in effect if, and to the extent that, the President declared a national emergency as a result of such lapse....

H.R.Rep. No. 95–459, at 13 (1977). Although the legislative history does not refer to the EAA's confidentiality provision, it does evince Congress's intent to authorize the President to preserve the operation of the export regulations promulgated under the EAA. Moreover, it is significant for purposes of determining legislative intent that Congress acted with the knowledge that the EAA's export regulations had long provided for confidentiality and that the President's ongoing practice of extending the EAA by executive order had always included these confidentiality protections. *Cf. United States v. Midwest Oil Co.,* 236 U.S. 459, 469–74, 35 S.Ct. 309, 311–13, 59 L.Ed. 673 (1915). Thus, in

*Irons & Sears,* the court was "extremely reluctant to impute to Congress an intent to eliminate the long-standing confidentiality accorded to patent applications absent rather unambiguous indications that this is what the Congress really wanted." 606 F.2d at 1220–21. A similar approach is appropriate here in light of Congress's express desire, as evidenced by its enactment of IEEPA and its knowledge of a pattern of consistent lapse-filling by executive order, to hold export application information in confidence.

Although Congress might have chosen to act in a manner that reflects the Wisconsin Project's formalistic emphasis on Exemption 3's requirement of a withholding statute — by, for example, making the EAA and section 12(c) permanent legislation — it did not, for reasons it explained. H.R.Rep. No. 95–459, at 13. Consequently, for purposes of determining congressional intent with respect to withholding certain export data from the public, considering the EAA in conjunction with other statutes is not inconsistent with FOIA's purpose or Exemption 3's text. Exemption 3 contemplates withholding pursuant to "clearly delineated statutory language," a phrase that admits of more than a single statutory source. Through the concerted operation of three congressional statutes — the EAA, the TWEA, and IEEPA — and in light of the Department's regulations and the President's executive orders pursuant to those statutes, the export control system has remained in place without interruption for over fifty years. 50 U.S.C. app. § 2401–20 (2000); EAA of 1969, Pub.L. 91–184, 83 Stat. 841, 845; Export Control Act of 1949, Pub.L. 81–11, 63 Stat. 7, 8–9. During that time, the Department has always retained the authority to withhold export license application information from public disclosure. 50 U.S.C. app. § 2411(c); EAA of 1969, Pub.L. 91–184, § 7(c), 83 Stat. 841, 845; Export Control Act of 1949, Pub.L. 81–11, § 6(c), 63 Stat. 7, 8–9. The Wisconsin Project points to nothing to indicate that this is not as the Congress intended.

While the Wisconsin Project's approach is attractive in its simplicity, it fails to come to grips with the statutory scheme Congress has erected for export data. The Wisconsin Project would effectively require the court to hold that Congress must act by a single statute if its legislation is to qualify as a withholding statute under Exemption 3, and that the confidentiality of the export data is undone by the EAA's expiration notwithstanding Congress's expectations to the contrary. In allowing the EAA to lapse from time to time, Congress has focused on a series of difficult and controversial questions having, so far as we are aware, nothing to do with its expectation that export data would remain confidential. *See* Dan Haendel & Amy L. Rothstein, *The Shifting Focus of Dual Use Export Controls,* 25 Int'l Law. 267 (1991); *Export Controls; Views Abound, Time Runs Out,* Economist, Oct. 1, 1983, at 45; Christopher Madison, *Congress, Administration Split on How to Plug Technology Leaks to Soviets,* Nat'l Journal, Feb. 19, 1983, at 380. Furthermore, the statutory scheme for ensuring the confidentiality of certain export data has none of the FAA's vagaries that concerned Congress, for the statutes do not "afford [the President] *cart[e] blanche* to withhold any information he pleases." H.R.Rep. No. 94–880, pt. 1, at 23, 1976 U.S.C.C.A.N. at 2205.

FOIA undoubtedly demands a liberal presumption of disclosure. But the Supreme Court has observed that the "statutory exemptions are intended to have meaningful reach and application." *John Doe Agency,* 493 U.S. at 152, 110 S.Ct. at 475. The Wisconsin Project's unduly strict reading of Exemption 3 strangles Congress's intent and deprives the exemption

of meaningful reach in the context of the export regulatory scheme. In rejecting this approach, the court does not diminish the requirement that an agency's decision not to disclose materials under Exemption 3 must be based upon "clearly delineated statutory language" that provides standards for withholding. In *Founding Church of Scientology v. Bell*, 603 F.2d 945, 951 (D.C.Cir.1979) (per curiam), the Federal Bureau of Investigation invoked Exemption 3 in withholding documents that a trial court in another proceeding had sealed under Rule 26(c) of the Federal Rules of Civil Procedure. The court held that "Exemption 3 is explicitly confined to material exempted from disclosure 'by statute,' and the Federal Rules of Civil Procedure simply do not satisfy this description." *Id.* at 952. The court noted that the rules "are issued by the Supreme Court under rulemaking powers delegated by Congress. Although proposed rules may be rejected by Congress, they are not affirmatively adopted by the legislature, as all statutes must be." *Id.* (footnotes omitted). Most importantly, the court observed that "the rule's standards for issuing protective orders do not comport with the criteria set forth in Exemption 3," because the rule affords broad discretion to the trial court and does not identify particular types of matters to be withheld. *Id.* There is no dispute, as the Wisconsin Project points out, that the EAA's export regulations and executive orders, like the Federal Rules, are not congressionally enacted statutes. *See INS v. Chadha*, 462 U.S. 919, 945–46, 103 S.Ct. 2764, 2781–82, 77 L.Ed.2d 317 (1983). But *Bell* is inapposite because the Federal Rules were originated and written not by Congress but by the Supreme Court, whereas the executive order here continued precisely the provision originated and written by Congress.

Our conclusion accords with the decision of the Eleventh Circuit Court of Appeals in *Times Publishing Co. v. United States Department of Commerce*, 236 F.3d 1286, 1288 (11th Cir.2001). The Eleventh Circuit confronted the same question: whether the Department may withhold export application information under Exemption 3 even where the EAA has expired. The court began with the principle established in this court's precedent that, "[w]here Congress has made plain its intention to exclude the information ... from public disclosure under FOIA, the purpose of Exemption 3 — to ensure that 'basic policy decisions on governmental secrecy are made by the Legislative rather than the Executive branch' — is satisfied." *Id.* (quoting *Am. Jewish Cong.*, 574 F.2d at 628). The court then noted that "Congress has renewed the confidentiality provision each time it has renewed the EAA" and that "Congress has authorized the President, also by means of statute, to maintain the force of the confidentiality provision by way of executive order." *Id.* at 1291. The court thus concluded "Congress has acted specifically to design a statutory provision to maintain confidentiality." *Id.* It followed that "the comprehensive legislative scheme as a whole — the confidentiality provision of the EAA, the intended and foreseen periodic expiration of the EAA, and the Congressional grant of power to the President to prevent the lapse of its important provisions during such times — exempts from disclosure the export licensing information requested by Appellees." *Id.* at 1292. We agree.

■ Finally, because IEEPA qualifies as an Exemption 3 statute, there can be no retroactivity problem. The Wisconsin Project contends that even if the EAA, with its concomitant regulations and executive orders, qualifies as an Exemption 3 withholding statute, applying the 2000 EAA amendment to protect the Department's 1994–2000 data improperly affords the amendment retroactive effect. But the

reenactment of the EAA confirmed, with respect to confidentiality, what has been the case all along. Hence, contrary to the Wisconsin Project's claim, in light of clear congressional intent, no "new legal consequences" are being attached "to events completed before its enactment," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270, 114 S.Ct. 1483, 1499, 128 L.Ed.2d 229 (1994), as would make application of the EAA impermissibly retroactive.

Accordingly, because the Department of Commerce properly invoked Exemption 3 in withholding specific export application data in response to the Wisconsin Project's request, and because Congress's amendment of the EAA in 2000 did not constitute unconstitutional retroactive legislation, we affirm the grant of judgment to the Department.

RANDOLPH, Circuit Judge, dissenting:

The statute has expired but its legislative history is good law. So say my colleagues, in a most curious opinion.

Exemption 3 of the Freedom of Information Act permits federal agencies to withhold documents "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3). We can all agree that if § 12(c) of the Export Administration Act, 50 U.S.C. app. § 2411(c), were a law, it would qualify as an Exemption 3 "statute." But the Export Act has expired. It has no more force than the statute requiring the appointment of Independent Counsel or the Sedition Act of 1798. It simply "no longer exists. Its life is at an end." *Greenwood v. Freight Co.*, 105 U.S. 13, 18, 26 L.Ed. 961 (1881).

Mere "formalism," a quibble, replies the majority. The Wisconsin Project's reading of Exemption 3 to require a "statute," the majority explains, "strangles Congress's intent." Maj. op. at 283. In other words, the Export Act may be gone, but congressional intent lives on: Congress at one time wanted the Commerce Department to keep the information secret, and so it shall remain. No matter that the Freedom of Information Act—a real law—expresses Congress's intent to require a statute exempting the documents from disclosure when they are sought or about to be released. (The only documents sought were applications filed during a time when the Export Act was not in effect.)

The majority also does a little, a very little, with the International Emergency Economic Powers Act, suggesting that it breathes life into the expired confidentiality provision of the Export Act. To qualify for Exemption 3 treatment under this theory, the Economic Powers Act must explicitly refer to the Export Act, if not its confidentiality provision. *See Irons & Sears v. Dann*, 606 F.2d 1215, 1220 (D.C.Cir.1979). The Economic Powers Act does not even mention the Export Act. Instead, it authorizes the President to "regulate . . . any . . . exportation of . . . or transactions involving, any property in which any foreign country or a national thereof has any interest" during a national emergency. 50 U.S.C. § 1702(a)(1)(B). The only indication the Economic Powers Act revived the Export Act comes not from its text but, as the majority imparts, maj. op. at 282–283, from a Committee report. The trouble is the Committee report does not mention keeping the expired Export Act alive; it talks only about preserving regulations the Commerce Department issued. Regulations are not statutes, under the Freedom of Information Act, or otherwise. More than that, the Committee report does not even refer to the Export Act's confidentiality provision. The Economic Powers Act, which does not itself exempt anything from disclosure, thus flatly fails to qualify as an Exemption 3 "statute." *See Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C.Cir. 2002).

The majority must realize the problem, so it asserts that an Executive Order "continued precisely" the Export Act's confidentiality provision. Maj. op. at 284. It never occurred to me, or to the Framers of the Constitution, that the Executive could by the stroke of a pen convert expired legislation into an existing statute. Besides, no Executive Order of any sort can satisfy Exemption 3, even if it tracks the language of expired legislation. *See Nat'l Ass'n of Home Builders,* 309 F.3d at 38. An Executive Order is not a statute. *See INS v. Chadha,* 462 U.S. 919, 945–46, 103 S.Ct. 2764, 2781–82, 77 L.Ed.2d 317 (1983).

Congress amended Exemption 3 in the wake of *FAA v. Robertson,* 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975), to restrict the Executive's discretion to withhold information; it required, as a condition for nondisclosure, an explicit nondisclosure statute. *See Am. Jewish Cong. v. Kreps,* 574 F.2d 624, 628–29, 631 (D.C.Cir. 1978). There is no such statute here. In the end all the majority can come up with is some free-floating congressional intent about the meaning of a statute that no longer exists. Alice once encountered a comparable phenomenon: " 'Well! I've often seen a cat without a grin,' thought Alice; 'but a grin without a cat! It's the most curious thing I ever saw in all my life!' " LEWIS CARROLL, ALICE IN WONDERLAND 69 (1946). I therefore respectfully dissent.