United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued December 9, 1997 Decided February 10, 1998 

 No. 97-5017

 Essential Information, Inc., et al., 

 Appellants

 v.

 United States Information Agency, 

 Appellee

 Appeal from the United States District Court 

 for the District of Columbia 

 (No. 96cv01194)

 Colette G. Matzzie argued the cause for the appellants. 
David C. Vladeck was on brief.

 Douglas N. Letter, Attorney, United States Department of 
Justice, argued the cause for the appellee. Frank W. Hun-
ger, Assistant Attorney General, and Mary Lou Leary, Act-
ing United States Attorney, were on brief.


 Before: Henderson, Randolph and Tatel, Circuit Judges.

 Opinion for the court filed by Circuit Judge Henderson.

 Concurring opinion filed by Circuit Judge Henderson.

 Dissenting opinion filed by Circuit Judge Tatel.

 Karen LeCraft Henderson, Circuit Judge: The appellants, 
who identify themselves as "researchers, scholars, organizers 
and journalists," Appellant's Brief at 6,1 seek disclosure under 
the Freedom of Information Act, 5 U.S.C. ss 552 et seq., 
(FOIA) of internet addresses and programming materials 
generated by the United States Information Agency (USIA).2 
The district court granted summary judgment in favor of 
USIA on the ground that USIA's records "are exempted from 
disclosure by statute," 5 U.S.C. s 552(b)(3)(B), namely by the 
Smith-Mundt Act (Act), which prohibits USIA from "dissemi-
nat[ing]" "information" or "distribut[ing]" "program material" 
within the United States, 22 U.S.C. ss 1461, 1461-1a. See 
Essential Info., Inc. v. USIA, C.A. No. 96-1194 (D.D.C. Nov. 
27, 1996) (Mem. Op.). We affirm the district court's judg-
ment on this ground.3

__________
 1 The appellants are: Essential Information, Inc, The Multina-
tional Monitor, Taxpayers Asset Project, Consumer Project on 
Technology, The Center for the Study of Responsive Law, James 
Love and Manon Ress.

 2 The appellants sought an electronic copy of the WIRELESS 
FILE, USIA's daily electronic news service, for the period July 1, 
1995 through February 9, 1996, transcripts of Voice of America and 
Worldnet Television broadcasts for the same period and internet 
addresses for sites where USIA overseas programming materials 
are available.

 3 In light of our disposition we need not reach the district court's 
holding that internet addresses are not "records" subject to FOIA 
disclosure. If USIA's internet addresses are "records"--and not 
simply "a means to access" records, as the district court character-
ized them, Mem. Op. at 2 (emphasis original), and as they seem to 
be--the information they contain is exempt from disclosure to the 
same extent as the other USIA information and program material 
disseminated or distributed abroad. We also note that, according 


 The FOIA requires generally that "each agency, upon any 
request for records which (i) reasonably describes such rec-
ords and (ii) is made in accordance with published rules 
stating the time, place, fees (if any), and procedures to be 
followed, shall make the records promptly available to any 
person." 5 U.S.C. s 552(a)(3). FOIA Exemption 3 shields 
from the general disclosure requirement "matters that--... 
are exempted from disclosure by statute (other than section 
552b of this title), provided that such statute (A) requires that 
the matters be withheld from the public in such a manner as 
to leave no discretion on the issue, or (B) establishes particu-
lar criteria for withholding or refers to particular types of 
matters to be withheld." 5 U.S.C. s 552(b)(3)(B). A "central 
aim" of the FOIA is "to substitute legislative judgment for 
administrative discretion." American Jewish Congress v. 
Kreps, 574 F.2d 624, 628 n.30 (D.C. Cir. 1978) (citing S. Rep. 
89-813, at 3-6 (1965). The aim is apparent in subsection (A) 
of Exemption 3 which, "on its face, is too rigorous to tolerate 
any decision making on the administrative level." Id. at 628. 
When "Congress has made plain its concern with a specific 
effect of publicity ..., Exemption 3 is to honor that concern." 
Id. at 629. The Congress has expressed its concern plainly in 
the Smith-Mundt Act and we must therefore apply Exemp-
tion 3.4

 Section 1461 of the Act directs that "information about the 
United States, its people, and its policies" that USIA pre-
pares or disseminates abroad "shall not be disseminated 
within the United States, its territories, or possessions" until 
twelve years after its preparation or dissemination when the 
Archivist of the United States (Archivist) is to oversee its 
"domestic distribution." 22 U.S.C. s 1461(a), (b).5 Similarly, 

__________
to the USIA, the appellants already have access to its only interna-
tional website.

 4 The dissent's assertion that Exemption 3 is limited to "statutes 
that protect confidential, private, or proprietary information," Dis-
sent at 3-4, is without basis in the statutory language, legislative 
history or case law.

 5 Section 1461(a) provides in full:


section 1461-1a provides that "no program material prepared 
by [USIA] shall be distributed within the United States" 
"[e]xcept as provided in section 1461," id. s 1461-1a.6 Each 
provision contains a flat ban on "dissemination" or "distribu-

__________
 (a) Dissemination of information abroad

 The Director is authorized, when he finds it appropriate, to 
 provide for the preparation, and dissemination abroad, of infor-
 mation about the United States, its people, and its policies, 
 through press, publications, radio, motion pictures, and other 
 information media, and through information centers and in-
 structors abroad. Subject to subsection (b) of this section, any 
 such information (other than "Problems of Communism" and 
 the "English Teaching Forum" which may be sold by the 
 Government Printing Office) shall not be disseminated within 
 the United States, its territories, or possessions, but, on re-
 quest, shall be available in the English language at the Agency, 
 at all reasonable times following its release as information 
 abroad, for examination only by representatives of United 
 States press associations, newspapers, magazines, radio sys-
 tems, and stations, and by research students and scholars, and, 
 on request, shall be made available for examination only to 
 Members of Congress.

22 U.S.C. s 1461(a) (emphasis added). For the text of section 
1461(b), see infra note 7.

 6 Section 1461-1a provides in full:

 Ban on domestic activities by United States Information 
 Agency

 Except as provided in section 1461 of this title and this 
 section, no funds authorized to be appropriated to the United 
 States Information Agency shall be used to influence public 
 opinion in the United States, and no program material pre-
 pared by the United States Information Agency shall be dis-
 tributed within the United States. This section shall not apply 
 to programs carried out pursuant to the Mutual Educational 
 and Cultural Exchange Act of 1961 (22 U.S.C. 2451 et seq.). 
 The provisions of this section shall not prohibit the United 
 States Information Agency from responding to inquiries from 
 members of the public about its operations, policies, or pro-
 gram.

22 U.S.C. s 1461-1a.


tion" for a twelve-year period.7 See S. Rep. No. 92-754, at 
82-85 (1972) (declaring that section 1461 "is a blanket prohibi-
tion barring public distribution of any and all materials 
produced by the United States Information Agency"). The 
Act even prescribes who may merely examine the materials. 
Thus, on its face the Act appears to be "the sort of nondisclo-
sure statute contemplated by FOIA exemption 3" because it 
is "a statute specifically exempting certain matters from 
disclosure to the general public and leaving [USIA] with no 
discretion to reveal those matters publicly." Tax Analysts v. 
Internal Revenue Serv., 117 F.3d 607, 611 (D.C. Cir. 1997).

 The statute's plain language is reinforced by the Congress's 
repeated amendment of the Act to clarify and strengthen the 
ban on domestic distribution of USIA materials. See Pub. L. 
No. 92-352, s 204, 86 Stat. 489, 494 (1972) (inserting express 
prohibition in section 1461 to remedy "obvious need for a 
specific prohibition against the domestic dissemination of any 
USIA materials," S. Rep. No. 92-754, at 85); Pub. L. No. 
99-93, s 208, 99 Stat. 405, 431 (1985) (enacting section 
1461-1a); Pub. L. No. 101-246, s 202, 104 Stat. 15, 49 (1990) 
(adding section 1461(b) which directs USIA to deliver materi-
als to Archivist "for domestic distribution" after 12 years, 
changing "[c]urrent law" which "prohibit[ed] the domestic 
release of almost all USIA materials," S. Rep. 101-46, 31 
(1989)); Pub. L. No. 103-236, s 232, 108 Stat. 382, 424 (1994) 
(amending section 1461-1a to make clear that ban does not 
prohibit responding to public inquiries). Particularly enlight-
ening are the circumstances surrounding the 1972 amend-
ment which first made the domestic distribution ban explicit. 
A member of the United States Senate had requested and 
obtained a USIA film which he intended to broadcast to his 
constituents. See S. Rep. No. 92-754, at 82-85. In direct 
response to the proposed broadcast, the Congress amended 
the Act to prohibit dissemination and distribution generally 

__________
 7 Although not permitted to distribute or disseminate the material 
for twelve years, USIA is required to make it available "for 
examination only" to representatives of the press, "research stu-
dents," "scholars" and members of the Congress. 22 U.S.C. 
s 1461(a) (set out supra in note 4).


and to restrict its own members' access to USIA materials to 
"examination only." See H.R. Rep. No. 1145, at 16 (1972) 
("provision was amended ... to clarify ... that U.S.I.A. 
materials are to be made available to Members of Congress 
for examination only and not for dissemination"). If the 
general citizenry were permitted to obtain the forbidden 
materials through the FOIA, as the appellants urge, the 
purpose of the 1972 amendment would be thwarted.

 The appellants argue that the Act is not a qualifying 
"nondisclosure" statute because the prohibited acts, "dissemi-
nation" and "distribution," are different from "disclosure." 
The former two, they argue, necessarily entail a broad unso-
licited dispersal rather than release of materials in response 
to specific, individual requests.8 We disagree. While the 
terms may be so distinguishable under some circumstances, 
the Act itself demonstrates that the Congress intended no 
such distinction here. Section 1461's prohibition against do-
mestic dissemination of USIA information is expressly made 
"[s]ubject to subsection (b)" of section 1461 which directs 
USIA, under the heading "Dissemination of information 
within United States," to "make available" program material, 
twelve years after its initial dissemination or preparation, to 
the Archivist "for domestic distribution " to "persons seeking 
its release in the United States." 22 U.S.C. s 1461(b) (em-
phasis added).9 The domestic "distribution" and "dissemina-

__________
 8 The dissenting opinion also attempts to distinguish "distribu-
tion/dissemination" from "disclosure" on the ground that the former 
includes "actively broadcasting or distributing information" while 
the latter is limited to "passively responding to individual requests 
to disclose." Dissent at 2. We are at a loss to understand how 
producing information in response to a request is more "passive" 
than broadcasting the same information sua sponte. Each activity 
(and each is an activity ) involves "dealing out" or "exposing to 
view" USIA materials. See Dissent at 1-2.

 9 Section 1461(b) provides in full:

 (b) Dissemination of information within United States

 (1) The Director of the United States Information Agency 
 shall make available to the Archivist of the United States, for 


tion" contemplated in this provision plainly encompass disclo-
sure to individual requesters. It seems unlikely that the two 
terms were meant to bear different meanings in the immedi-
ately preceding prohibition. Perhaps more importantly, the 
Congress had no need to make an exception for such disclo-
sure after 12 years unless the general dissemination and 
distribution bans otherwise prohibited it. In sum, the Act is 
an emphatic non disclosure statute forbidding all domestic 
distribution and dissemination except insofar as the Act itself 
makes exceptions and it is only via the exceptions that the 
Act can be said to "specifically require[ ] disclosure." See 
Dissent at 1.

 The appellants also contend that the Act is not a nondisclo-
sure act because it does not prohibit all disclosure of records 
but only disclosure to persons in this country. This argu-
ment must fail as well. The court has previously found that a 
limitation on the persons to whom disclosure is prohibited 

__________
 domestic distribution, motion pictures, films, videotapes, and 
 other material prepared for dissemination abroad 12 years 
 after the initial dissemination of the material abroad or, in the 
 case of such material not disseminated abroad, 12 years after 
 the preparation of the material.

 (2) The Director of the United States Information Agency 
 shall be reimbursed for any attendant expenses. Any reim-
 bursement to the Director pursuant to this subsection shall be 
 credited to the applicable appropriation of the United States 
 Information Agency.

 (3) The Archivist shall be the official custodian of the materi-
 al and shall issue necessary regulations to ensure that persons 
 seeking its release in the United States have secured and paid 
 for necessary United States rights and licenses and that all 
 costs associated with the provision of the material by the 
 Archivist shall be paid by the persons seeking its release. The 
 Archivist may charge fees to recover such costs, in accordance 
 with section 2116(c) of Title 44. Such fees shall be paid into, 
 administered, and expended as part of the National Archives 
 Trust Fund.

22 U.S.C. s 1461(b).


does not remove a nondisclosure statute from Exemption 3's 
ambit. See Church of Scientology of Calif. v. Internal Reve-
nue Serv., 792 F.2d 146, 148-50 (D.C. Cir. 1986) (holding 
Exemption 3 embraces statute prohibiting disclosure of tax-
payer records excepting, inter alia, "disclosure to specified 
private individuals (e.g., taxpayer to whom information re-
lates) or government officials, rather than to the public at 
large"). So too here.

 Finally, the appellants argue that the Congress could not 
have intended "so irrational a system" that would allow some 
United States residents, such as those close to a national 
border or with friends abroad, to obtain USIA records while 
denying other residents access to them. We find nothing 
irrational in the system the Congress has established. USIA 
has been directed "to provide for the preparation, and dis-
semination abroad, of information about the United States, its 
people, and its policies." 22 U.S.C. s 1461(a). When USIA 
carries out this mandate, in some cases individuals within the 
United States will be able to obtain access to the information 
disseminated, as Congress has elsewhere explicitly recog-
nized. See 22 U.S.C. s 1465bb (directing that USIA "shall 
provide for the open communication of information and ideas 
through the use of television broadcasting to Cuba" "notwith-
standing the limitation of section 1461 of this title with 
respect to the dissemination in the United States of informa-
tion prepared for dissemination abroad to the extent such 
dissemination is inadvertent"). The Act's prohibition of do-
mestic dissemination by USIA is a reasonable means of 
minimizing such access.

 For the preceding reasons we hold that the material sought 
by the appellants is within FOIA Exemption 3 and therefore 
not required to be disclosed because it is "exempted from 
disclosure" by the Smith-Mundt Act, 22 U.S.C. ss 1461, 
1461-1a. Accordingly, the judgment of the district court is

Affirmed. 



Karen LeCraft Henderson, Circuit Judge, concurring:

 Although I agree that the Smith-Mundt Act is a "nondis-
closure" statute within Exemption 3, I write separately to 
offer an alternative ground for affirmance, urged here by the 
government, because it is at least arguably a disclosure 
statute regulating rather than prohibiting disclosure. If that 
is the case, I believe the appellants are foreclosed from 
seeking disclosure through the FOIA under Ricchio v. Kline, 
773 F.2d 1389 (D.C. Cir. 1985).1

 In Ricchio, the court held that the FOIA does not govern 
disclosure of transcripts of White House recordings for which 
the Congress had established a separate disclosure regimen 
in the Presidential Recordings and Materials Preservation 
Act (Materials Act), 44 U.S.C. s 2111 note (formerly 44 
U.S.C. 2107 note). The Materials Act directs the Archivist to 
submit to the Congress proposed regulations for providing 
public access to specified presidential materials from the 
Nixon administration, balancing the interests of the public 
and of President Nixon and his heirs. Relying on the Su-
preme Court's observation that "the policies of the [Materials] 
Act can best be carried out under the Act itself," the court 
concluded that "release of the transcripts pursuant to the 
Information Act ... 'might frustrate the achievement of the 
legislative goals of orderly processing and protection of the 
rights of all affected persons.' " 773 F.2d at 1395 (quoting 
Nixon v. Warner Communications, Inc., 435 U.S. 589, 606 

__________
 1 Although our decision may, as our dissenting colleague suggests, 
produce some anomalous results, we must nonetheless read and 
enforce the statutes as the Congress wrote them. See Busic v. 
United States, 446 U.S. 398, 404 (1980) ("[I]t suffices to say that the 
asserted unreasonableness flows not from ... this decision, but 
rather from the statutes as Congress wrote them. If corrective 
action is needed, it is the Congress that must provide it. 'It is not 
for us to speculate, much less act, on whether Congress would have 
altered its stance had the specific events of this case been anticipat-
ed.' ") (quoting TVA v. Hill, 437 U.S. 153, 185 (1978)); see also 
Lewis Carroll, Alice in Wonderland, in The Annotated Alice 230-31 
(Martin Gardner ed. 1960) ("Contrariwise, ... if it was so, it might 
be; and if it were so, it would be; but as it isn't, it ain't.")


(1978) (holding petitioner had no common-law right of access 
to tapes subject to Materials Act in custody of trial court)). 
Because the Materials Act "provided a comprehensive, care-
fully tailored and detailed procedure designed to protect both 
the interest of the public in obtaining disclosure of President 
Nixon's papers and of President Nixon in protecting the 
confidentiality of Presidential conversations and delibera-
tions," the court determined that "the proper method" for 
obtaining access to covered materials was "by proceeding 
under the Materials Act" and that the plaintiff therefore 
"c[ould not] proceed under the Information Act." Id. The 
same reasoning applies here.

 As with the Materials Act, the Congress drafted the access 
provisions of the Smith-Mundt Act to accommodate compet-
ing interests. Recognizing the benefit of making the materi-
als available to researchers and journalists as well as to its 
own members, the Congress struck a balance between that 
interest and the "underlying rationale for the prohibition on 
domestic dissemination of USIA materials: namely that 
USIA should not be engaged in domestic propaganda," 
S. Rep. No. 101-46, 31 (1989), by providing limited, "examina-
tion only" access to USIA materials. See 22 U.S.C. 
s 14661(a). Later, because it "believe[d] there is little likeli-
hood that material 12 or more years old will be of significant 
use for domestic propaganda purposes," the Congress direct-
ed that the materials be made generally available twelve 
years after their preparation or dissemination. The access, 
however, is also limited by the requirement that property 
rights in the materials be protected through regulation by the 
Archivist. See 22 U.S.C. s 1461(b)(3) ("The Archivist ... 
shall issue necessary regulations to ensure that persons seek-
ing its release in the United States have secured and paid for 
necessary United States rights and licenses....").2 I believe 
that, to the extent that the Smith-Mundt Act is a disclosure 
statute, its "comprehensive, carefully tailored and detailed 
procedure," like that of the Materials Act, precludes obtaining 

__________
 2 The Archivist has promulgated the required regulations which 
are codified at 36 C.F.R. s 1256.58.


access to USIA materials under the FOIA. See 773 F.2d at 
1395.3 To conclude otherwise would "frustrate the achieve-
ment of the legislative goals" underlying the express statuto-
ry limitation on access to program materials during the first 
twelve years after preparation or broadcast. See Ricchio, 773 
F.2d at 1395.

__________
 3 Church of Scientology of Calif. v. Internal Revenue Serv., 792 
F.2d 146 (D.C. Cir. 1986), aff'd, 484 U.S. 9 (1987), cited by the 
dissent, considered a statute that was, by the court's own character-
ization, a nondisclosure rather than a disclosure statute. To the 
extent that the Smith-Mundt Act is a nondisclosure statute, it is 
"covered by Exemption 3," 792 F.2d at 149, as explained in the 
majority opinion.



 Tatel, Circuit Judge, dissenting: Contrary to our obli-
gation to construe FOIA exemptions narrowly, John Doe 
Agency v. John Doe Corp., 493 U.S. 146, 152 (1989), as well as 
the longstanding requirement that congressional intent to 
exempt matters from FOIA disclosure must appear in the 
"actual words" of the statute, Reporters Committee for Free-
dom of the Press v. U.S. Dep't of Justice, 816 F.2d 730, 734 
(D.C. Cir.), clarified, 831 F.2d 1124 (D.C. Cir. 1987), rev'd on 
other grounds, 489 U.S. 749 (1989), the court today extends 
FOIA's exemption for "matters ... specifically exempted 
from disclosure by statute," 5 U.S.C. s 552(b)(3) (1994) (em-
phasis added), to cover a statute that specifically requires 
disclosure, that has resulted in the widespread availability of 
the very information the court now exempts from FOIA, and 
that Congress intended only to prohibit official government 
propaganda. Under the court's decision, information the 
Smith-Mundt Act specifically requires USIA to make avail-
able, i.e., disclose, to the press, scholars, students, and mem-
bers of Congress, see 22 U.S.C. s 1461(a) (1994), cannot be 
obtained under FOIA. Residents of southern Florida can 
receive Radio Marti and TV Marti broadcasts, owners of 
satellite dishes anywhere in the United States can receive 
Worldnet television, domestic computer users can find materi-
als intended for foreign audiences on the agency's web pages, 
and people anywhere in the country can ask friends overseas 
to obtain USIA program materials for their own domestic 
use, but under today's decision, these same people cannot 
obtain precisely the same information through FOIA.

 The court arrives at this counter-intuitive result by focus-
ing on the Smith-Mundt Act's prohibition of domestic "dis-
semination" and "distribution" of USIA program materials. 
Maj. Op. at 6-7. "Dissemination" and "distribution," howev-
er, differ significantly from "disclosure," the focus of Exemp-
tion 3. The dictionary defines "disseminate" as "to spread or 
send out freely or widely as though sowing or strewing seed," 
and "distribute" as "to deal out," "apportion," or "to spread 
out or scatter so as to cover a surface or a space." Webster's 
Third New International Dictionary 656, 660 (1993). "Dis-


close" means "to open up" or "to expose to view." Id. at 645. 
Dissemination requires disclosure; disclosure requires no dis-
semination. Properly defined, then, the Smith-Mundt Act 
bars the agency from actively broadcasting or distributing 
information domestically, not from passively responding to 
individual FOIA requests to disclose.

 The statute itself recognizes the difference between "dis-
semination" and "disclosure." For example, while prohibiting 
domestic "dissemination," section 1461 mandates domestic 
"disclosure" by requiring USIA to make available program 
materials in English to journalists and researchers for exami-
nation at the agency, and to members of Congress more 
generally. 22 U.S.C. s 1461(a). Section 1461-1a prohibits 
USIA from using its funds to "distribute" program materials 
"within the United States," while explicitly "not prohibit[ing] 
[the agency] from responding to inquiries from members of 
the public about its operations, policies, or programs." Id. 
s 1461-1a. If Congress had intended to deny FOIA access to 
program materials, why would it have required the agency to 
answer citizens' questions about program materials? In a 
similar vein, having specifically authorized USIA to "dissemi-
nate" program materials by radio, television, and other means 
certain to result in some spillover to domestic audiences, see, 
e.g., id. s 1465bb (mandating television broadcasting to Cuba, 
"notwithstanding the limitation of section 1461 ... to the 
extent such [domestic] dissemination is inadvertent"), why at 
the same time would Congress have prohibited domestic 
disclosure of those very same materials?

 Congress used the words "dissemination" and "distribu-
tion," instead of "disclosure," quite deliberately. Responding 
to our now colleague Senator James Buckley's plan to air a 
USIA film entitled "Czechoslovakia 1968" over New York 
public television, as well as to a letter from the Acting 
Attorney General stating that the broadcast would not violate 
the Smith-Mundt Act, see S. Rep. No. 92-754, at 83-85 (1972), 
Congress limited congressional access to examination only 
and added the agency dissemination ban to prevent the 
government from "propagandizing the American public," id. 


at 85, not to bar USIA from disclosing information to individ-
ual requestors pursuant to FOIA. See Pub. L. No. 92-352, 
s 204, 86 Stat. 489, 494 (1972) (now codified at 22 U.S.C. 
s 1461(a)). In fact, this 1972 amendment broadened the 
statute's public access provision, adding scholars and students 
to the list of individuals eligible to examine program materi-
als. Id.

 Relying on section 1461(b)'s requirement that USIA trans-
fer its program materials twelve years after their initial 
dissemination abroad to the National Archives "for domestic 
distribution" to "persons seeking [their] release in the United 
States," the court concludes that Congress equated "dissemi-
nation" and "distribution" with "disclosure." Maj. Op. at 6-7. 
But section 1461(b) says only that when USIA transfers its 
materials to the Archives after twelve years, the Archives 
must have procedures for releasing them to requesting indi-
viduals. Believing that "there is little likelihood that material 
12 or more years old will be of significant use for domestic 
propaganda purposes," Congress created section 1461(b) to 
"provide[ ] for the automatic release of USIA films and 
materials in the United States after 12 years." S. Rep. No. 
101-46, at 31 (1989). This provision tells us nothing about 
USIA's current obligations to persons seeking FOIA disclo-
sure of program materials.

 By protecting from FOIA disclosure nonconfidential infor-
mation widely available outside the United States and, to an 
increasing extent, domestically, the court breaks with long-
standing precedent. Until this case, we have limited Exemp-
tion 3 to statutes that protect confidential, private, or proprie-
tary information, such as patent applications, Irons and Sears 
v. Dann, 606 F.2d 1215, 1221 (D.C. Cir. 1979); CIA intelli-
gence sources and methods, Gardels v. CIA, 689 F.2d 1100, 
1103 (D.C. Cir. 1982); grand jury proceedings, Fund for 
Const'l Gov't v. National Archives and Records Serv., 656 
F.2d 856, 868 (D.C. Cir. 1981); tax returns and return 
information, Moody v. IRS, 654 F.2d 795, 797 (D.C. Cir. 
1981); and meetings of the Defense Nuclear Facilities Safety 
Board discussing highly sensitive matters regarding nuclear 
facilities, Natural Resources Defense Council, Inc. v. Defense 


Nuclear Facilities Safety Bd., 969 F.2d 1248, 1251 (D.C. Cir. 
1992) (under the analogous Exemption 3 to the Government 
in the Sunshine Act, 5 U.S.C. s 552b(c)(3)).

 "The basic purpose of FOIA is to ensure an informed 
citizenry, vital to the functioning of a democratic society, 
needed to check against corruption and to hold the governors 
accountable to the governed." NLRB v. Robbins Tire & 
Rubber Co., 437 U.S. 214, 242 (1978). Congress has ex-
pressed no intent to keep USIA program materials confiden-
tial or exempt them from FOIA disclosure. Its only concern, 
stated originally in 1972 and reiterated in a 1985 amendment 
prohibiting USIA funds from being "used to influence public 
opinion in the United States," Pub. L. No. 99-93, s 208, 99 
Stat. 405, 431 (1985) (codified at 22 U.S.C. s 1461-1a), is to 
protect the American people from official government propa-
ganda. Fulfilling individual FOIA requests for specific pro-
gram materials would not frustrate this purpose. Extending 
Exemption 3 to widely available, nonconfidential USIA mate-
rials will frustrate FOIA's mandate for open government. I 
respectfully dissent.

 * * *

 In her concurring opinion, Judge Henderson suggests that 
our decision in Ricchio v. Kline, 773 F.2d 1389 (D.C. Cir. 
1985), provides an alternative basis for exempting USIA 
program materials from FOIA disclosure. See Conc. Op. 
Unlike the statutory scheme involved in Ricchio, however, the 
Smith-Mundt Act creates no " 'comprehensive scheme' ... 
duplicating [the rules and procedures] of FOIA," Church of 
Scientology v. IRS, 792 F.2d 146, 149 (D.C. Cir. 1986), aff'd, 
484 U.S. 9 (1987), for public access to USIA program materi-
als. Although under Ricchio, a statute need not exactly 
mirror FOIA's disclosure scheme, the Smith-Mundt Act's 
public access provision does not come remotely close. That 
provision applies only to certain classes of requestors (press, 
scholars, students, and members of Congress), prohibits re-
questors from obtaining verbatim copies, Gartner v. USIA, 
726 F. Supp. 1183, 1187 n.5 (S.D. Iowa 1989), gives USIA no 
means to assert privilege or exemption claims, and provides 
for no judicial review equivalent to FOIA procedures. 22 


U.S.C. s 1461. FOIA access, moreover, would neither "frus-
trate the achievement of the legislative goals" of the Smith-
Mundt Act's public access provision, Ricchio, 773 F.2d at 
1395, nor make that provision superfluous. FOIA requires 
that requests for information "reasonably describe[ ]" such 
information, 5 U.S.C. s 552(a)(3); by comparison, a research-
er utilizing the Smith-Mundt Act's public access provision can 
examine the entire body of USIA program materials without 
specifically identifying the information sought, 22 U.S.C. 
s 1461(a). The Smith-Mundt Act also requires USIA to 
make program materials available in English, id.; FOIA 
contains no similar translation requirement.

 In the thirteen years since Ricchio, we have not applied it 
to any other statute. We rejected reasoning similar to Ric-
chio's in Church of Scientology, finding it "impossible to 
conclude that [FOIA] was sub silentio repealed by s 6103" of 
the Internal Revenue Code. 792 F.2d at 149. The Ninth 
Circuit refused to apply Ricchio to Rule 32 of the Federal 
Rules of Criminal Procedure and 18 U.S.C. s 4208 in Julian 
v. U.S. Department of Justice, 806 F.2d 1411, 1420 (9th Cir. 
1986), aff'd, 486 U.S. 1 (1988). Ricchio has no applicability 
here either.