**ESSENTIAL INFORMATION, INC., et al., Appellants,**

v.

**UNITED STATES INFORMATION AGENCY, Appellee.**

No. 97–5017.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 9, 1997.

Decided Feb. 10, 1998.

Colette G. Matzzie, Washington, DC, argued the cause for the appellants. David C. Vladeck, Washington, DC, was on brief.

Douglas N. Letter, Attorney, United States Department of Justice, Washington, DC, argued the cause for the appellee. Frank W. Hunger, Assistant Attorney General, and Mary Lou Leary, Acting United States Attorney, Washington, DC, were on brief.

Before: HENDERSON, RANDOLPH and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

Concurring opinion filed by Circuit Judge KAREN LeCRAFT HENDERSON.

Dissenting opinion filed by Circuit Judge TATEL.

KAREN LeCRAFT HENDERSON, Circuit Judge:

The appellants, who identify themselves as "researchers, scholars, organizers and journalists," Appellant's Brief at 6,[1] seek disclosure under the Freedom of Information Act, 5 U.S.C. §§ 552 *et seq.*, (FOIA) of internet addresses and programming materials generated by the United States Information Agency (USIA).[2] The district court granted summary judgment in favor of USIA on the ground that USIA's records "are exempted from disclosure by statute," 5 U.S.C. § 552(b)(3)(B), namely by the Smith–Mundt Act (Act), which prohibits USIA from "disseminat[ing]" "information" or "distribut[ing]" "program material" within the United States, 22 U.S.C. §§ 1461, 1461–1a. *See Essential Info., Inc. v. USIA,* C.A. No. 96–1194 (D.D.C. Nov. 27, 1996) (Mem. Op.). We affirm the district court's judgment on this ground.[3]

The FOIA requires generally that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3). FOIA Exemption 3 shields from the general disclosure requirement "matters that—... are exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(B). A "central aim" of the FOIA is "to substitute legislative judgment for administrative discretion." *American Jewish Congress v. Kreps,* 574 F.2d 624, 628 n. 30 (D.C.Cir.1978) (citing S. Rep. 89–813, at 3–6 (1965)). The aim is apparent in subsection (A) of Exemption 3 which, "on its face, is too rigorous to tolerate any decision making on the administrative level." *Id.* at 628. When "Congress has made plain its concern with a specific effect of publicity ..., Exemption 3 is to honor that concern." *Id.* at 629. The Congress has expressed its concern plainly in the Smith–Mundt Act and we must therefore apply Exemption 3.[4]

Section 1461 of the Act directs that "information about the United States, its people, and its policies" that USIA prepares or disseminates abroad "shall not be disseminated within the United States, its territories, or possessions" until twelve years after its preparation or dissemination when the Archivist of the United States (Archivist) is to oversee its "domestic distribution." 22 U.S.C. § 1461(a), (b).[5] Similarly, section 1461–1a

1. The appellants are: Essential Information, Inc, The Multinational Monitor, Taxpayers Asset Project, Consumer Project on Technology, The Center for the Study of Responsive Law, James Love and Manon Ress.

2. The appellants sought an electronic copy of the WIRELESS FILE, USIA's daily electronic news service, for the period July 1, 1995 through February 9, 1996, transcripts of Voice of America and Worldnet Television broadcasts for the same period and internet addresses for sites where USIA overseas programming materials are available.

3. In light of our disposition we need not reach the district court's holding that internet addresses are not "records" subject to FOIA disclosure. If USIA's internet addresses are "records"—and not simply "a *means* to access" records, as the district court characterized them, Mem. Op. at 2

(emphasis original), and as they seem to be—the information they contain is exempt from disclosure to the same extent as the other USIA information and program material disseminated or distributed abroad. We also note that, according to the USIA, the appellants already have access to its only international website.

4. The dissent's assertion that Exemption 3 is limited to "statutes that protect confidential, private, or proprietary information," *Dissent* at 1171, is without basis in the statutory language, legislative history or case law.

5. Section 1461(a) provides in full:

(a) Dissemination of information abroad
   The Director is authorized, when he finds it appropriate, to provide for the preparation, and dissemination abroad, of information

provides that "no program material prepared by [USIA] shall be distributed within the United States" "[e]xcept as provided in section 1461," *id.* § 1461–1a.[6] Each provision contains a flat ban on "dissemination" or "distribution" for a twelve-year period.[7] *See* S.Rep. No. 92–754, at 82–85 (1972) (declaring that section 1461 "is a blanket prohibition barring public distribution of any and all materials produced by the United States Information Agency"). The Act even prescribes who may merely examine the materials. Thus, on its face the Act appears to be "the sort of nondisclosure statute contemplated by FOIA exemption 3" because it is "a statute specifically exempting certain matters from disclosure to the general public and leaving [USIA] with no discretion to reveal those matters publicly." *Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 611 (D.C.Cir.1997).

The statute's plain language is reinforced by the Congress's repeated amendment of the Act to clarify and strengthen the ban on domestic distribution of USIA materials. *See* Pub.L. No. 92–352, § 204, 86 Stat. 489, 494 (1972) (inserting express prohibition in section 1461 to remedy "obvious need for a specific prohibition against the domestic dissemination of any USIA materials," S.Rep. No. 92–754, at 85); Pub.L. No. 99–93, § 208, 99 Stat. 405, 431 (1985) (enacting section 1461–1a); Pub.L. No. 101–246, § 202, 104 Stat. 15, 49 (1990) (adding section 1461(b) which directs USIA to deliver materials to Archivist "for domestic distribution" after 12 years, changing "[c]urrent law" which "prohibit[ed] the domestic release of almost all USIA materials," S. Rep. 101–46, 31 (1989)); Pub.L. No. 103–236, § 232, 108 Stat. 382, 424 (1994) (amending section 1461–1a to make clear that ban does not prohibit responding to public inquiries). Particularly enlightening are the circumstances surrounding the 1972 amendment which first made the domestic distribution ban explicit. A member of the United States Senate had requested and obtained a USIA film which he intended to broadcast to his constituents. *See* S.Rep. No. 92–754, at 82–85. In direct response to the proposed broadcast, the Congress amended the Act to prohibit dissemination and distribution generally and to restrict its own members' access to USIA materials to "examination only." *See* H.R.Rep. No. 1145, at 16 (1972) ("provision was amended ... to clarify ... that U.S.I.A. materials are to be made available to Members of Congress for examination only and not for dissemination"). If the general citizenry were permitted to obtain the forbidden materials through the FOIA, as the appellants urge, the purpose of the 1972 amendment would be thwarted.

---

about the United States, its people, and its policies, through press, publications, radio, motion pictures, and other information media, and through information centers and instructors abroad. *Subject to subsection (b) of this section, any such information* (other than "Problems of Communism" and the "English Teaching Forum" which may be sold by the Government Printing Office) *shall not be disseminated within the United States, its territories, or possessions,* but, on request, shall be available in the English language at the Agency, at all reasonable times following its release as information abroad, for examination only by representatives of United States press associations, newspapers, magazines, radio systems, and stations, and by research students and scholars, and, on request, shall be made available for examination only to Members of Congress.

22 U.S.C. § 1461(a) (emphasis added). For the text of section 1461(b), see *infra* note 7.

6. Section 1461–1a provides in full:

Ban on domestic activities by United States Information Agency

Except as provided in section 1461 of this title and this section, no funds authorized to be appropriated to the United States Information Agency shall be used to influence public opinion in the United States, and no program material prepared by the United States Information Agency shall be distributed within the United States. This section shall not apply to programs carried out pursuant to the Mutual Educational and Cultural Exchange Act of 1961 (22 U.S.C. 2451 *et seq.*). The provisions of this section shall not prohibit the United States Information Agency from responding to inquiries from members of the public about its operations, policies, or program.

22 U.S.C. § 1461–1a.

7. Although not permitted to distribute or disseminate the material for twelve years, USIA is required to make it available "for examination only" to representatives of the press, "research students," "scholars" and members of the Congress. 22 U.S.C. § 1461(a) (set out *supra* in note 4).

The appellants argue that the Act is not a qualifying "nondisclosure" statute because the prohibited acts, "dissemination" and "distribution," are different from "disclosure." The former two, they argue, necessarily entail a broad unsolicited dispersal rather than release of materials in response to specific, individual requests.[8] We disagree. While the terms may be so distinguishable under some circumstances, the Act itself demonstrates that the Congress intended no such distinction here. Section 1461's prohibition against domestic dissemination of USIA information is expressly made "[s]ubject to subsection (b)" of section 1461 which directs USIA, under the heading "*Dissemination* of information within United States," to "make available" program material, twelve years after its initial dissemination or preparation, to the Archivist "for domestic *distribution*" to "persons seeking its release in the United States." 22 U.S.C. § 1461(b) (emphasis added).[9] The domestic "distribution" and "dissemination" contemplated in this provision plainly encompass disclosure to individual requesters. It seems unlikely that the two terms were meant to bear different meanings in the immediately preceding prohibition. Perhaps more importantly, the Congress had no need to make an exception for such disclosure after 12 years unless the general dissemination and distribution bans otherwise prohibited it. In sum, the Act is an emphatic *non* disclosure statute forbidding all domestic distribution and dissemination except insofar as the Act itself makes exceptions and it is only via the exceptions that the Act can be said to "specifically require[ ] disclosure." *See Dissent* at 1170.

The appellants also contend that the Act is not a nondisclosure act because it does not prohibit all disclosure of records but only disclosure to persons *in this country.* This argument must fail as well. The court has previously found that a limitation on the persons to whom disclosure is prohibited does not remove a nondisclosure statute from Exemption 3's ambit. *See Church of Scientology of Calif. v. Internal Revenue Serv.,* 792 F.2d 146, 148–50 (D.C.Cir.1986) (holding Exemption 3 embraces statute prohibiting disclosure of taxpayer records excepting, *inter alia,* "disclosure to specified private individuals (*e.g.,* taxpayer to whom information relates) or government officials, rather than to the public at large"). So too here.

Finally, the appellants argue that the Congress could not have intended "so irrational a system" that would allow some United States residents, such as those close to a national border or with friends abroad, to obtain USIA records while denying other residents access to them. We find nothing irrational in the system the Congress has established. USIA has been directed "to provide for the preparation, and dissemination abroad, of information about the United States, its people,

---

**8.** The dissenting opinion also attempts to distinguish "distribution/dissemination" from "disclosure" on the ground that the former includes "actively broadcasting or distributing information" while the latter is limited to "passively responding to individual requests to disclose." *Dissent* at 1171. We are at a loss to understand how producing information in response to a request is more "passive" than broadcasting the same information *sua sponte.* Each activity (and each *is* an *activity*) involves "dealing out" or "exposing to view" USIA materials. *See Dissent* at 1170.

**9.** Section 1461(b) provides in full:

(b) Dissemination of information within United States

(1) The Director of the United States Information Agency shall make available to the Archivist of the United States, for domestic distribution, motion pictures, films, videotapes, and other material prepared for dissemination abroad 12 years after the initial dissemination of the material abroad or, in the case of such material not disseminated abroad, 12 years after the preparation of the material.

(2) The Director of the United States Information Agency shall be reimbursed for any attendant expenses. Any reimbursement to the Director pursuant to this subsection shall be credited to the applicable appropriation of the United States Information Agency.

(3) The Archivist shall be the official custodian of the material and shall issue necessary regulations to ensure that persons seeking its release in the United States have secured and paid for necessary United States rights and licenses and that all costs associated with the provision of the material by the Archivist shall be paid by the persons seeking its release. The Archivist may charge fees to recover such costs, in accordance with section 2116(c) of Title 44. Such fees shall be paid into, administered, and expended as part of the National Archives Trust Fund.

22 U.S.C. § 1461(b).

and its policies." 22 U.S.C. § 1461(a). When USIA carries out this mandate, in some cases individuals within the United States will be able to obtain access to the information disseminated, as Congress has elsewhere explicitly recognized. *See* 22 U.S.C. § 1465bb (directing that USIA "shall provide for the open communication of information and ideas through the use of television broadcasting to Cuba" "notwithstanding the limitation of section 1461 of this title with respect to the dissemination in the United States of information prepared for dissemination abroad to the extent such dissemination is inadvertent"). The Act's prohibition of domestic dissemination by USIA is a reasonable means of minimizing such access.

For the preceding reasons we hold that the material sought by the appellants is within FOIA Exemption 3 and therefore not required to be disclosed because it is "exempted from disclosure" by the Smith–Mundt Act, 22 U.S.C. §§ 1461, 1461–1a. Accordingly, the judgment of the district court is

*Affirmed.*

KAREN LeCRAFT HENDERSON, Circuit Judge, concurring:

Although I agree that the Smith–Mundt Act is a "nondisclosure" statute within Exemption 3, I write separately to offer an alternative ground for affirmance, urged here by the government, because it is at least arguably a *disclosure statute* regulating rather than prohibiting disclosure. If that is the case, I believe the appellants are foreclosed from seeking disclosure through the FOIA under *Ricchio v. Kline,* 773 F.2d 1389 (D.C.Cir.1985).[1]

In *Ricchio,* the court held that the FOIA does not govern disclosure of transcripts of White House recordings for which the Congress had established a separate disclosure

regimen in the Presidential Recordings and Materials Preservation Act (Materials Act), 44 U.S.C. § 2111 note (formerly 44 U.S.C. 2107 note). The Materials Act directs the Archivist to submit to the Congress proposed regulations for providing public access to specified presidential materials from the Nixon administration, balancing the interests of the public and of President Nixon and his heirs. Relying on the Supreme Court's observation that "the policies of the [Materials] Act can best be carried out under the Act itself," the court concluded that "release of the transcripts pursuant to the Information Act ... 'might frustrate the achievement of the legislative goals of orderly processing and protection of the rights of all affected persons.'" 773 F.2d at 1395 (quoting *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 606, 98 S.Ct. 1306, 1316, 55 L.Ed.2d 570 (1978) (holding petitioner had no common-law right of access to tapes subject to Materials Act in custody of trial court)). Because the Materials Act "provided a comprehensive, carefully tailored and detailed procedure designed to protect both the interest of the public in obtaining disclosure of President Nixon's papers and of President Nixon in protecting the confidentiality of Presidential conversations and deliberations," the court determined that "the proper method" for obtaining access to covered materials was "by proceeding under the Materials Act" and that the plaintiff therefore "c[ould not] proceed under the Information Act." *Id.* The same reasoning applies here.

As with the Materials Act, the Congress drafted the access provisions of the Smith–Mundt Act to accommodate competing interests. Recognizing the benefit of making the materials available to researchers and journalists as well as to its own members, the Congress struck a balance between that interest and the "underlying rationale for the

1. Although our decision may, as our dissenting colleague suggests, produce some anomalous results, we must nonetheless read and enforce the statutes as the Congress wrote them. *See Busic v. United States,* 446 U.S. 398, 405, 100 S.Ct. 1747, 1752, 64 L.Ed.2d 381 (1980) ("[I]t suffices to say that the asserted unreasonableness flows not from ... this decision, but rather from the statutes as Congress wrote them. If corrective action is needed, it is the Congress that must

provide it. 'It is not for us to speculate, much less act, on whether Congress would have altered its stance had the specific events of this case been anticipated.'") (quoting *TVA v. Hill,* 437 U.S. 153, 185, 98 S.Ct. 2279, 2297, 57 L.Ed.2d 117 (1978)); *see also* Lewis Carroll, *Alice in Wonderland,* in *The Annotated Alice* 230–31 (Martin Gardner ed.1960) ("Contrariwise, ... if it was so, it might be; and if it were so, it would be; but as it isn't, it ain't.")

prohibition on domestic dissemination of USIA materials: namely that USIA should not be engaged in domestic propaganda,"S.Rep. No. 101–46, 31 (1989), by providing limited, "examination only" access to USIA materials. *See* 22 U.S.C. § 1461(a). Later, because it "believe[d] there is little likelihood that material 12 or more years old will be of significant use for domestic propaganda purposes," the Congress directed that the materials be made generally available twelve years after their preparation or dissemination. The access, however, is also limited by the requirement that property rights in the materials be protected through regulation by the Archivist. *See* 22 U.S.C. § 1461(b)(3) ("The Archivist ... shall issue necessary regulations to ensure that persons seeking its release in the United States have secured and paid for necessary United States rights and licenses....").[2] I believe that, to the extent that the Smith–Mundt Act is a disclosure statute, its "comprehensive, carefully tailored and detailed procedure," like that of the Materials Act, precludes obtaining access to USIA materials under the FOIA. *See* 773 F.2d at 1395.[3] To conclude otherwise would "frustrate the achievement of the legislative goals" underlying the express statutory limitation on access to program materials during the first twelve years after preparation or broadcast. *See Ricchio,* 773 F.2d at 1395.

TATEL, Circuit Judge, dissenting:

Contrary to our obligation to construe FOIA exemptions narrowly, *John Doe Agency v. John Doe Corp.,* 493 U.S. 146, 152, 110 S.Ct. 471, 475, 107 L.Ed.2d 462 (1989), as well as the longstanding requirement that congressional intent to exempt matters from FOIA disclosure must appear in the "actual words" of the statute, *Reporters Committee for Freedom of the Press v. U.S. Dep't of Justice,* 816 F.2d 730, 734 (D.C.Cir.), *clarified,* 831 F.2d 1124 (D.C.Cir.1987), *rev'd on other grounds,* 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989), the court today extends FOIA's exemption for "matters ... *specifically exempted* from disclosure by statute," 5 U.S.C. § 552(b)(3) (1994) (emphasis added), to cover a statute that *specifically requires* disclosure, that has resulted in the widespread availability of the very information the court now exempts from FOIA, and that Congress intended only to prohibit official government propaganda. Under the court's decision, information the Smith–Mundt Act specifically requires USIA to make available, *i.e.,* disclose, to the press, scholars, students, and members of Congress, *see* 22 U.S.C. § 1461(a) (1994), cannot be obtained under FOIA. Residents of southern Florida can receive Radio Marti and TV Marti broadcasts, owners of satellite dishes anywhere in the United States can receive Worldnet television, domestic computer users can find materials intended for foreign audiences on the agency's web pages, and people anywhere in the country can ask friends overseas to obtain USIA program materials for their own domestic use, but under today's decision, these same people cannot obtain precisely the same information through FOIA.

The court arrives at this counter-intuitive result by focusing on the Smith–Mundt Act's prohibition of domestic "dissemination" and "distribution" of USIA program materials. *Maj. Op.* at 1168. "Dissemination" and "distribution," however, differ significantly from "disclosure," the focus of Exemption 3. The dictionary defines "disseminate" as "to spread or send out freely or widely as though sowing or strewing seed," and "distribute" as "to deal out," "apportion," or "to spread out or scatter so as to cover a surface or a space." Webster's Third New International Dictionary 656, 660 (1993). "Disclose" means "to open up" or "to expose to view." *Id.* at 645. Dissemination requires disclosure; disclosure requires no dissemination.

---

**2.** The Archivist has promulgated the required regulations which are codified at 36 C.F.R. § 1256.58.

**3.** *Church of Scientology of Calif. v. Internal Revenue Serv.,* 792 F.2d 146 (D.C.Cir.1986), *aff'd,* 484 U.S. 9, 108 S.Ct. 271, 98 L.Ed.2d 228 (1987), cited by the dissent, considered a statute that was, by the court's own characterization, a *nondisclosure* rather than a *disclosure* statute. To the extent that the Smith–Mundt Act is a *nondisclosure* statute, it is "covered by Exemption 3," 792 F.2d at 149, as explained in the majority opinion.

Properly defined, then, the Smith–Mundt Act bars the agency from actively broadcasting or distributing information domestically, not from passively responding to individual FOIA requests to disclose.

The statute itself recognizes the difference between "dissemination" and "disclosure." For example, while prohibiting domestic "dissemination," section 1461 mandates domestic "disclosure" by requiring USIA to make available program materials in English to journalists and researchers for examination at the agency, ánd to members of Congress more generally. 22 U.S.C. § 1461(a). Section 1461–1a prohibits USIA from using its funds to "distribute" program materials "within the United States," while explicitly "not prohibit[ing] [the agency] from responding to inquiries from members of the public about its operations, policies, or programs." *Id.* § 1461–1a. If Congress had intended to deny FOIA access to program materials, why would it have required the agency to answer citizens' questions about program materials? In a similar vein, having specifically authorized USIA to "disseminate" program materials by radio, television, and other means certain to result in some spillover to domestic audiences, *see, e.g., id.* § 1465bb (mandating television broadcasting to Cuba, "notwithstanding the limitation of section 1461 ... to the extent such [domestic] dissemination is inadvertent"), why at the same time would Congress have prohibited domestic disclosure of those very same materials?

Congress used the words "dissemination" and "distribution," instead of "disclosure," quite deliberately. Responding to our now colleague Senator James Buckley's plan to air a USIA film entitled "Czechoslovakia 1968" over New York public television, as well as to a letter from the Acting Attorney General stating that the broadcast would not violate the Smith–Mundt Act, *see* S.REP. No. 92–754, at 83–85 (1972), Congress limited congressional access to examination only and added the agency dissemination ban to prevent the government from "propagandizing the American public," *id.* at 85, not to bar USIA from disclosing information to individual requestors pursuant to FOIA. *See* Pub.L. No. 92–352, § 204, 86 Stat. 489, 494

(1972) (now codified at 22 U.S.C. § 1461(a)). In fact, this 1972 amendment broadened the statute's public access provision, adding scholars and students to the list of individuals eligible to examine program materials. *Id.*

Relying on section 1461(b)'s requirement that USIA transfer its program materials twelve years after their initial dissemination abroad to the National Archives "for domestic distribution" to "persons seeking [their] release in the United States," the court concludes that Congress equated "dissemination" and "distribution" with "disclosure." *Maj. Op.* at 1168. But section 1461(b) says only that when USIA transfers its materials to the Archives after twelve years, the Archives must have procedures for releasing them to requesting individuals. Believing that "there is little likelihood that material 12 or more years old will be of significant use for domestic propaganda purposes," Congress created section 1461(b) to "provide[ ] for the automatic release of USIA films and materials in the United States after 12 years." S.REP. No. 101–46, at 31 (1989). This provision tells us nothing about USIA's *current* obligations to persons seeking FOIA disclosure of program materials.

By protecting from FOIA disclosure non-confidential information widely available outside the United States and, to an increasing extent, domestically, the court breaks with longstanding precedent. Until this case, we have limited Exemption 3 to statutes that protect confidential, private, or proprietary information, such as patent applications, *Irons and Sears v. Dann*, 606 F.2d 1215, 1221 (D.C.Cir.1979); CIA intelligence sources and methods, *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C.Cir.1982); grand jury proceedings, *Fund for Const'l Gov't v. National Archives and Records Serv.*, 656 F.2d 856, 868 (D.C.Cir.1981); tax returns and return information, *Moody v. IRS*, 654 F.2d 795, 797 (D.C.Cir.1981); and meetings of the Defense Nuclear Facilities Safety Board discussing highly sensitive matters regarding nuclear facilities, *Natural Resources Defense Council, Inc. v. Defense Nuclear Facilities Safety Bd.*, 969 F.2d 1248, 1251 (D.C.Cir.1992) (under the analogous Exemption 3 to the Gov-

ernment in the Sunshine Act, 5 U.S.C. § 552b(c)(3)).

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242, 98 S.Ct. 2311, 2327, 57 L.Ed.2d 159 (1978). Congress has expressed no intent to keep USIA program materials confidential or exempt them from FOIA disclosure. Its only concern, stated originally in 1972 and reiterated in a 1985 amendment prohibiting USIA funds from being "used to influence public opinion in the United States," Pub.L. No. 99–93, § 208, 99 Stat. 405, 431 (1985) (codified at 22 U.S.C. § 1461–1a), is to protect the American people from official government propaganda. Fulfilling individual FOIA requests for specific program materials would not frustrate this purpose. Extending Exemption 3 to widely available, nonconfidential USIA materials will frustrate FOIA's mandate for open government. I respectfully dissent.

\*       \*       \*

In her concurring opinion, Judge Henderson suggests that our decision in *Ricchio v. Kline,* 773 F.2d 1389 (D.C.Cir.1985), provides an alternative basis for exempting USIA program materials from FOIA disclosure. *See* Conc. Op. Unlike the statutory scheme involved in *Ricchio,* however, the Smith–Mundt Act creates no " 'comprehensive scheme' ... duplicating [the rules and procedures] of FOIA," *Church of Scientology v. IRS,* 792 F.2d 146, 149 (D.C.Cir.1986), *aff'd,* 484 U.S. 9, 108 S.Ct. 271, 98 L.Ed.2d 228 (1987), for public access to USIA program materials. Although under *Ricchio,* a statute need not exactly mirror FOIA's disclosure scheme, the Smith–Mundt Act's public access provision does not come remotely close. That provision applies only to certain classes of requestors (press, scholars, students, and members of Congress), prohibits requestors from obtaining verbatim copies, *Gartner v. USIA,* 726 F.Supp. 1183, 1187 n. 5 (S.D.Iowa 1989), gives USIA no means to assert privilege or exemption claims, and provides for no judicial review equivalent to FOIA procedures. 22 U.S.C. § 1461. FOIA access, moreover, would neither "frustrate the achievement of the legislative goals" of the Smith–Mundt Act's public access provision, *Ricchio,* 773 F.2d at 1395, nor make that provision superfluous. FOIA requires that requests for information "reasonably describe[ ]" such information, 5 U.S.C. § 552(a)(3); by comparison, a researcher utilizing the Smith–Mundt Act's public access provision can examine the entire body of USIA program materials without specifically identifying the information sought, 22 U.S.C. § 1461(a). The Smith–Mundt Act also requires USIA to make program materials available in English, *id.;* FOIA contains no similar translation requirement.

In the thirteen years since *Ricchio,* we have not applied it to any other statute. We rejected reasoning similar to *Ricchio*'s in *Church of Scientology,* finding it "impossible to conclude that [FOIA] was *sub silentio* repealed by § 6103" of the Internal Revenue Code. 792 F.2d at 149. The Ninth Circuit refused to apply *Ricchio* to Rule 32 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 4208 in *Julian v. U.S. Department of Justice,* 806 F.2d 1411, 1420 (9th Cir.1986), *aff'd,* 486 U.S. 1, 108 S.Ct. 1606, 100 L.Ed.2d 1 (1988). *Ricchio* has no applicability here either.